2001 UT 19

**STATE of Utah, Plaintiff and Appellee,**

v.

**Ronald Watson LAFFERTY, Defendant and Appellant.**

**No. 970111.**

Supreme Court of Utah.

Feb. 23, 2001.

Mark Shurtleff, Att'y Gen., Kris C. Leonard, Creighton C. Horton, Michael Wims, Asst. Att'ys Gen., Salt Lake City, for plaintiff.

Michael D. Esplin, Margaret P. Lindsay, Provo, for defendant.

HOWE, Chief Justice:

¶ 1 Defendant Ronald Watson Lafferty appeals from a judgment and conviction of two counts of first degree murder, aggravated burglary, and conspiracy to commit first degree murder. He was sentenced to death for the murder convictions. On appeal, he makes eight separate challenges: (1) whether the trial court erred in determining that he was competent to stand trial; (2) whether the trial court erred in granting the State's challenge for cause to remove Juror 220; (3) whether Utah's insanity defense, section 76–2–305 of the Utah Code, violates the Eighth Amendment to the United States Constitution and article I, section 9 of the Utah Constitution; (4) whether the trial court erred by admitting victim impact evidence during the penalty phase; (5) whether the trial court erred by allowing the introduction of statements made by defendant and his brother Dan Lafferty to the media; (6) whether the trial court erred by refusing to give defendant's requested instruction that the jury could consider sympathy or mercy in reaching its verdict during the penalty phase; (7) whether Utah's death penalty statute, section 76–3–207 of the Utah Code, is unconstitutional under the Eighth Amendment of the United States Constitution and article I, sections 7 and 9 of the Utah Constitution; and (8) whether the retrial of defendant violated the Double Jeopardy Clause of the Fifth Amendment to the United States Con-

stitution and article I, section 12 of the Utah Constitution.

## BACKGROUND

■ ¶ 2 The history leading up to the commission of these crimes is extensive and disturbing, but sheds light specifically on the issue of competency as well as the other issues raised by the defense on appeal. In reviewing the jury verdict, we view the facts and all reasonable inferences drawn therefrom in the light most favorable to the verdict. *See State v. Loose*, 2000 UT 11, ¶ 2, 994 P.2d 1237; *State v. Brown*, 948 P.2d 337, 339 (Utah 1997). We present conflicting evidence only as necessary to understand the issues before us on appeal. *See State v. Dunn*, 850 P.2d 1201, 1206 (Utah 1993).

## I. EVENTS PRECEDING JULY 24, 1984

¶ 3 Ronald Watson Lafferty was raised in Orem, Utah, the oldest son in a family of eight children. He was brought up in a strictly religious family, and was himself an active member of the Church of Jesus Christ of Latter-day Saints (the LDS Church). At nineteen years of age, he served for two years as a volunteer missionary for the LDS Church in Florida. Approximately six months after he returned from his mission, defendant married Diana Sayer. They are the parents of six children. Acquaintances who knew defendant prior to 1982 described him as a strong family man. He was also a prominent member of his community, serving for a time on the city council in Highland, Utah.

¶ 4 During the period between 1982 and 1983, defendant began to change. He started spending increasingly large amounts of time with his brother Dan Lafferty. Dan had been in constant trouble with law en-forcement for years for failing to pay taxes and disobeying licensing regulations.[1] As Dan and defendant conversed, defendant became increasingly converted to Dan's philosophies on government intervention. His appearance changed markedly. He went from being very clean cut and well groomed to wearing long hair and an unkempt beard and having the appearance of a "mountain man."

¶ 5 Defendant began to meet regularly with Dan, as well as with brothers Tim, Mark, and Watson, to discuss politics and religion. Defendant became increasingly critical of the LDS Church. Those who knew him well remarked that he seemed to have changed drastically not only in his beliefs, but in his personality as well. He began to stray further and further from mainstream society and was excommunicated from the LDS Church in 1983.[2]

¶ 6 The following year, defendant's wife Diana filed for and obtained a divorce and moved with their six children to Florida. Defendant felt his excommunication was unjust and was distraught over the dissolution of his marriage.

¶ 7 The brothers continued to meet together and opened their religious and political discussions to others with similar viewpoints. Through this process, they met Robert Crossfield, a man from Canada claiming to be a prophet. Crossfield asserted that he had directions from God to teach the Lafferty brothers how to receive revelation and organize themselves into what he called the "School of the Prophets."[3] The brothers claimed they began to receive communications from God and would meet as a group to discuss these "revelations."

¶ 8 It was during this time that defendant first told his brothers that he had received a revelation that his ex-wife Diana had been

---

1. In 1982, Dan and another brother, Mark Lafferty, were practicing chiropractors in their parents' basement. The county placed a lien on the home when Dan refused to pay taxes. Members of the family convinced defendant to try to talk with Dan and straighten out the tax issues associated with the home. It appears as though defendant's close interaction with Dan began around this time.

2. The reasons given for defendant's excommunication were violating the law of the land, refusing to support his children, failing to sustain the leaders of the church, and teaching and advocating doctrine contrary to that of the church.

3. Allen, the youngest of the brothers, was not directly involved with the School of the Prophets. Dan testified, "I don't think Allen necessarily showed an interest. He wasn't called. We were all called by revelation, and he wasn't called."

the wife of the devil in a previous world. Defendant believed their union angered the devil, who in turn caused him trouble in this world out of jealousy. In the spring of 1984, defendant claimed to have received another revelation from God (the "removal revelation") ordering that four people were to be "removed." Among those to be "removed" were his brother Allen's wife Brenda, their fifteen-month-old daughter Erica, Richard Stowe, and Chloe Low.[4]

¶ 9 Prior to this time, defendant had expressed negative feelings to other family members and friends about the four persons named in the removal revelation. Defendant believed that all four in some way had either helped his wife obtain a divorce or played a part in his excommunication from the LDS Church. Defendant thought Brenda had encouraged Diana to leave and divorce him. On several occasions before the removal revelation, defendant called Brenda a "bitch" and told Allen that Brenda "had better stop talking to Diana" and that "he didn't want her meddling in their affairs." After the removal revelation, defendant stated that Erica needed to be removed as well because "she would grow up to be a bitch just like her mother."[5] Chloe Low was also a friend of Diana's who helped and encouraged Diana to leave defendant. Richard Stowe was defendant's and Diana's ecclesiastical leader in the LDS Church and was a member of the church council that decided to excommunicate defendant. He also counseled Diana during the divorce proceedings as her ecclesiastical leader and helped her obtain financial aid from the LDS Church.

¶ 10 In conjunction with the removal revelation, defendant claimed to have received another revelation on March 13, 1984, commanding that he and the School of the Prophets "consecrate" an "instrument" to be used in the removal of the four named individuals.[6] When he discussed this new revelation, only Dan and Watson agreed to such an action; the others involved with the School of the Prophets felt that this and the removal revelation were not of God and disassociated themselves from the revelations. The School of the Prophets disbanded because of disagreement over this issue, but Dan and defendant continued in their belief that the revelations needed to be fulfilled.

## II. JULY 24, 1984

¶ 11 On the morning of July 24, 1984, defendant, Dan, and friends Charles Carnes ("Chip") and Ricky Knapp planned to go to

---

4. The removal revelation went as follows:

   Thus saith the Lord unto my servants the prophets. It is my will and commandment that ye remove the following individuals in order that my work might go forward. For they have truly become obstacles in my path and I will not allow my work to be stopped. First thy brother's wife Brenda and her baby, then Chloe Low, and then Richard Stowe. And it is my will that they be removed in rapid succession and that an example be made of them in order that others might see the fate of those who fight against the true saints of God. And it is my will that this matter be taken care of as soon as possible and I will prepare a way for my instrument to be delivered and instruction be given unto my servant Todd. And it is my will that he show great care in his duties for I have raised him up and prepared him for this important work and is he not like unto my servant Porter Rockwell. And great blessings await him if he will do my will, for I am the Lord thy God and have control over all things. Be still and know that I am with thee. Even so Amen.

   Todd, referred to in the removal revelation, was a hitchhiker whom Watson Lafferty picked up and brought into his home. Within a few weeks, Todd stole multiple personal effects belonging to the Laffertys and disappeared.

5. It is clear from the record that Allen was made aware of the removal revelation prior to the murders of his wife and daughter, even though he did not participate in the School of the Prophets. He testified at trial that he was shocked when Dan and defendant approached him about the removal revelation. He told them he had received no such revelation and would defend his wife and daughter with his life. Earlier, defendant told Allen that "people weren't safe in meddling in his affairs anymore, that he felt justified in taking action of some sort against people who crossed him."

6. That revelation stated:

   And it is my will that the instrument that I have delivered unto thee be consecrated, dedicated, and set apart in the school for my purposes. And it is my will that it be delivered unto he whom I have raised up, even my son, ... and that he be instructed by the school. And I will prepare a way by which my work in these matters may be accomplished.

Salt Lake City for the day.[7] Before leaving, defendant told the group he felt impressed that they should go to his brother Mark's house to pick up a rifle. Once they arrived there, Mark asked what they were going to do with the gun, because defendant had quit hunting years earlier. Defendant replied that he was going hunting for "[a]ny fucking thing that gets in my way." The men then headed to Allen's apartment, apparently to look for another rifle. On the way, Dan and defendant began discussing whether the removal revelation was to be fulfilled that day.

¶ 12 When the four reached the apartment, defendant exited the car and knocked on the front door. The three other men remained in the car. When no one answered, defendant returned to the car and drove away, heading toward Salt Lake City. Before they had driven far, Dan said he felt impressed to turn around and return to Allen's apartment. When they arrived, Dan went to the door and knocked. This time, Brenda Lafferty answered the door.

¶ 13 Dan pushed past Brenda into the apartment and was inside alone with Brenda for a few minutes when the men in the car heard the two fighting inside the apartment. Defendant then left the car and entered the apartment as well. Chip testified at trial that once defendant entered the apartment, he could hear defendant calling Brenda a "bitch" and a "liar," and could hear Brenda being physically beaten. From where he sat in the car in the driveway, Chip heard Brenda screaming, "Don't hurt my baby. Please don't hurt my baby." He could also hear the baby crying, "Mommy, mommy, mommy." The apartment then became quiet. A few minutes later, Dan and defendant emerged from the rear of the apartment and entered the car, their clothes covered in blood.

¶ 14 The men next drove to the Low residence. On the way, defendant commented that Chloe Low would be an easy target because of her small size. When they reached Low's house and determined no one was there, the men broke into the house and

took numerous items. As they left Low's house, defendant began talking about going on to Richard Stowe's home.

¶ 15 After accidentally missing the turnoff to the Stowe residence, Dan and defendant decided to abandon trying to fulfill the rest of the revelation. They stopped at a service station and then headed toward Wendover. Chip testified that on the way, defendant pulled a knife out of his boot, started to bang it on his knee, and said, "I killed her. I killed her. I killed the bitch. I can't believe I killed her." He then handed the knife to Dan, and said, "Thank you, Brother, for doing the baby because I don't think I had it in me." Dan replied, "It was no problem." [8]

¶ 16 Once in Wendover, the group rented a small kitchenette apartment where they cleaned up, ate, and spent the night. The next night, afraid of what the Lafferty brothers had said they had done, Ricky and Chip quietly left the apartment and drove away in the car. While traveling along Interstate 80, they found the knife in the car, rolled it in a towel, and threw it out the window. Later in Twin Falls, Idaho, they disposed of a bag of bloody clothing and other personal effects belonging to defendant and Dan. They then proceeded to Chip's brother's house in Cheyenne, Wyoming, where they were arrested on July 30, 1984. Defendant and Dan were taken into custody by the FBI in Reno, Nevada, on August 17, 1984.

¶ 17 On the evening of July 24, 1984, Allen Lafferty came home from work to find his wife Brenda and baby Erica lifeless in their apartment. Brenda was in the kitchen lying in a pool of blood. She had sustained a severe beating and had contusions and bruises on her face, head, shoulders, arms, thigh, knees, and back. There was evidence of strangulation where a vacuum cord had been tightly and repeatedly wrapped around her neck. Her throat was cut; a six-inch-long incision sliced through her trachea, both jugular veins, and both carotid arteries and left a cut on her spinal column. Blood was

---

7. There is some dispute in the record as to where the men were actually headed that day; however, their actual destination is not material to this appeal.

8. Dan Lafferty testified at trial that he alone killed both Brenda and Erica. Ricky Knapp, the only other passenger in the car besides defendant and Chip Carnes, did not testify.

smeared on the walls, drapes, door, and light switches, and there was other evidence throughout the apartment of a major struggle.

¶ 18 Fifteen-month-old Erica was found in a puddle of her own blood, propped up against the back of her crib with her head slumped over. Her throat was cut cleanly from ear to ear; the wound measured five and one-half inches. The incision sliced through both her carotid arteries, both jugular veins, and her esophagus and cut her cervical spinal column. All that attached her head to her body was bone and a little tissue. The medical examiner's report indicated that both Brenda and Erica were alive at the time their throats were slit.

## PROCEDURAL HISTORY

¶ 19 This case is before us for the second time after a second jury trial. At the first trial, defendant and Dan were charged with the commission of two capital felonies involving the deaths of Brenda and Erica Lafferty, aggravated burglary of the victims' home and of the home of Chloe Low, and two counts each of conspiracy to commit first degree homicide of Chloe Low and Richard Stowe.

¶ 20 The brothers were originally arraigned together, and the judge entered pleas of not guilty on their behalf when both declined to enter pleas. Prior to the first trial, two competency evaluations were made. On September 28, 1984, two court-appointed alienists found both men "not incompetent to proceed." At a second hearing on November 1, 1984, an evaluation at the Utah State Hospital resulted in a finding of competency. Thereafter, defendant attempted to commit suicide while in jail, and the State filed a third petition to determine competency. At this point, the trial court found defendant incompetent to proceed and ordered that he be sent to the state hospital for treatment. The trial court then severed defendant's trial from Dan's. Dan was convicted by a jury on all four counts and sentenced to life in prison.

¶ 21 A fourth competency hearing was held before defendant's first trial. The court found him competent to stand trial. A jury trial was then conducted April 25, 1985,

through May 7, 1985, and defendant was found guilty on all counts. The death penalty was imposed for the two capital homicides.

¶ 22 Following an unsuccessful appeal to this court, see State v. Lafferty, 749 P.2d 1239 (Utah 1988) ("Lafferty I"), defendant filed a federal habeas corpus petition that was ultimately granted by the Tenth Circuit Court of Appeals, holding that the state trial court had applied the wrong legal standard to determine competency. See Lafferty v. Cook, 949 F.2d 1546 (10th Cir.1991) ("Lafferty II"). Defendant's convictions and sentences were consequently vacated.

¶ 23 Defendant was charged again with two counts each of first degree felony criminal homicide, first degree aggravated burglary, and second degree conspiracy to commit criminal homicide. In November 1992, yet another competency hearing was held. After hearing testimony from Dr. Louis Moench, Dr. Robert Howell, and Dr. Phillip Washburn, the court found defendant was not competent to stand trial because of mental illness. Defendant was returned to the state hospital for treatment. At a subsequent competency hearing in February 1994, at which Dr. Steven Golding and Dr. Noel C. Gardner testified, the court determined that defendant was currently competent to stand trial. Trial was then delayed by defendant's filing of several motions and the disqualification of the county attorney's office. Finally, in February 1996, jury selection began.

¶ 24 After defendant was removed from the courtroom on several occasions for engaging in verbal and physical outbursts, defense counsel filed a motion opposing future removal of defendant from the courtroom during the trial. Allegations in the supporting memorandum to the motion again raised questions of competency, and the State moved to determine whether another competency hearing was required. When interviews of defendant by two experts contained conflicting conclusions, the trial court determined a full competency hearing was necessary and requested that eight experts who had previously examined defendant do so again to determine current competency.

¶ 25 In March 1996, the expert witnesses for the State, Drs. Gardner, Golding, Cohn,

and Wootton, found defendant competent to stand trial. Experts for the defense, Drs. Howell, Groesbeck, and Washburn, testified that defendant was mentally ill and not competent to proceed. Dr. Heinbecker, also a defense expert, opined that further observation was needed to make a competency determination. Taking into consideration all the alienists' evaluations, the trial court ultimately ruled that defendant was competent to stand trial. .

¶ 26 Trial proceeded from March 25, 1996, to April 10, 1996, after which a second jury returned a verdict of guilty on all counts of criminal homicide, aggravated burglary, and conspiracy to commit criminal homicide. In April 1996, the penalty phase was conducted, and the jury unanimously rendered a verdict of death for both counts of capital homicide. Defendant appeals and has been granted a stay of execution pending this appeal.

### ANALYSIS

### I. COMPETENCY

¶ 27 Defendant contends that the trial court erred in failing to comply with the provisions of Utah Code Ann. §§ 77–15–1 to –9 (1995), which provide guidelines for determining whether an accused is competent to stand trial. He challenges both the trial court's application of section 77–15–5 and its factual findings. First, as to application of the statute, he asserts that the use of examiners who had already affiliated themselves with either the State or the defense violated the intent of the statute; that the statutory timetable was not followed in obtaining the expert testimony; that many of the reports lacked in content; and that interviews alone were insufficient bases for the experts' testimonies. He contends these alleged errors denied him his right to due process and equal protection pursuant to the Fourteenth Amendment to the United States Constitution and article I, sections 7 and 24 of the Utah Constitution. Second, defendant contends the trial court's finding of competency was clearly erroneous. Finally, defendant challenges the trial court's denial of his motion for a new trial.

*A. Compliance with Section 77–15–5*

1. Use of Prior Alienists in Competency Evaluation

¶ 28 The relevant statutory section pertaining to expert testimony in a competency hearing is section 77–15–5(2)(b): "The defendant shall be examined by at least two mental health experts not involved in the current treatment of the defendant." Defendant charges that the court did not meet the requirements of the statute when it allowed experts who had testified previously to participate in this competency hearing.

¶ 29 First, the trial court conducted an informal, preliminary investigation to determine whether a full competency hearing was needed. Initially, defendant objected to the participation of any expert who had been used in previous proceedings in this case. The judge then asked whether any of the experts could be agreed upon. Counsel for defendant and the State then agreed to allow an alienist from each side to investigate whether a legitimate issue of competency existed. Neither of these experts was involved with the immediate treatment of defendant. Thus, even the initial evaluations met the requirements of section 77–15–5(2)(b).

¶ 30 Upon receiving conflicting initial evaluations on defendant's competency from the two alienists, the trial court decided a full competency hearing was necessary. The court ordered that defendant be evaluated by eight of the mental health experts previously appointed by the court, none of whom were involved in the current treatment of defendant. Defense counsel expressed concern that Dr. Groesbeck, one of defendant's prior witnesses, would not be in town to participate in the competency hearing, and stated that he would prefer not to use a substitute. Counsel stated that Dr. Groesbeck "was present during the interview, which I think is—a lot of these things came out—and I think it is important to have him here." Defense counsel then agreed to let Dr. Groesbeck testify early rather than have a substitute participate in the competency hearing.

¶ 31 Section 77–15–5(2)(b) is clear and unambiguous, and we will not read it to be

unduly restrictive. It requires examination by "two mental heath experts not involved in the current treatment of the defendant." None of the participating experts in either the informal or the formal hearings were involved in the immediate treatment of defendant. Thus, the requirements of section 77–15–5(2)(b) were met.

¶ 32 Defendant argues, however, that the intent of section 77–15–5(2)(b) is to appoint *independent* examiners. He has not offered, nor can we deduce, any language in the statute that would require appointed alienists to be completely independent of the proceedings. In fact, because the statute explicitly requires that the mental health experts not be involved in the *current* treatment, it can be fairly inferred that the legislature anticipated that an alienist who had testified previously could appropriately be called later to testify as to competency as long as the alienist was not currently treating the accused.

### 2. Compliance with Statutory Timetable

¶ 33 Defendant next contends that the trial court did not allow sufficient time for receipt and consideration of the court-appointed alienists' written reports. Specifically, he asserts that the trial court's failure to follow the statutory timetable set forth in section 77–15–5(9) denied him his right to due process and equal protection of the law guaranteed by article I, sections 7 and 24 of the Utah Constitution and the Fourteenth Amendment to the United States Constitution because there was insufficient time for his experts to prepare a response before they were called upon to testify.

¶ 34 Section 77–15–5(9) provides in pertinent part that "[w]hen the report is received the court shall set a date for a mental hearing which shall be held in not less than five and not more than 15 days...." Although it is not clear from the face of the

record when defense counsel received them, all four of the State's witnesses' written reports were filed with the district court on the afternoon of March 13, 1996.[9] The competency hearing was held the next day.

¶ 35 Conducting the hearing less than five days after receipt of the reports by the court and counsel was error and not in compliance with the requirements of section 75–15–5(9). However, "[a]n erroneous decision by a trial court 'cannot result in reversible error unless the error is harmful.'" *State v. Robertson*, 932 P.2d 1219, 1227 (Utah 1997) (quoting *State v. Hamilton*, 827 P.2d 232, 240 (Utah 1992)). An error is harmful if it undermines our confidence in the verdict; if, minus that error, there is a sufficiently high likelihood of a different outcome. *See id.* (citing *Hamilton*, 827 P.2d at 240). "The burden of showing harmfulness ... rests on the complaining party." *Id.; see also State v. Bishop*, 753 P.2d 439, 448 (Utah 1988) (*"Bishop II"*) overruled on other grounds by *State v. Menzies*, 889 P.2d 393 (Utah 1994) (*"Menzies II"*)(holding that "appellant has the burden of establishing that reversible error resulted from an abuse of discretion"); *Ashton v. Ashton*, 733 P.2d 147, 154 (Utah 1987).

¶ 36 Defendant has not presented any evidence that such a reversible error has occurred. At no time during the competency hearing did he assert that the hearing schedule did not allow sufficient time. In fact, both defendant and the State, by their actions, consented to the procedure. Regardless, we do not believe that any additional time would have changed the outcome of the hearing. Eight alienists reported their current findings as to defendant's competency at the hearing. All eight observed defendant prior to the March 14 hearing and testified in earlier competency determinations. Defendant petitioned the court to allow his witness,

---

9. We note that Drs. Groesbeck and Howell, witnesses for the defense, did not submit written reports to the court. Defendant petitioned to have both of them testify as to competency without written reports. The State agreed to such a procedure. Under the "invited error" doctrine, we have held repeatedly that a party cannot on appeal "take advantage of an error committed at trial when that party led the trial court into committing the error." *See State v. Dunn*, 850 P.2d 1201, 1220 (Utah 1993); *State v. Tillman*, 750 P.2d 546, 560–61 (Utah 1987) (*"Tillman I"*). If anything, defendant received an advantage because the State's experts did not have an opportunity to review the defense's reports before they gave their testimony.

Dr. Groesbeck, to testify at a date previous to the actual competency hearing and without a written report. All of the alienists testified consistently with their earlier opinions in this case, except for Dr. Heinbecker, one of defendant's own alienists, who testified that he felt he needed more time to observe defendant before making a determination. Each alienist testified in depth, and both the State and the defense were given ample opportunity to cross-examine.

¶ 37 While we hold that the competency hearing held fewer than five days after receiving the written reports was a technical violation of the statute, it constituted harmless error and in no way undermines our confidence in the verdict.

3. Content of Reports

■ ¶ 38 Defendant also contends that the experts' reports did not address the specific items required by section 77–15–5(4), which governs the scope of an expert's examination and report to the court in a competency hearing. Section 77–15–5(4) provides:

The experts shall in the conduct of their examination and in their report to the court consider and address, in addition to any other factors determined to be relevant by the experts:

(a) the defendant's present capacity to:

(i) comprehend and appreciate the charges or allegations against him;

(ii) disclose to counsel pertinent facts, events, and states of mind;

(iii) comprehend and appreciate the range and nature of possible penalties, if applicable, that may be imposed in the proceedings against him;

(iv) engage in reasoned choice of legal strategies and options;

(v) understand the adversary nature of the proceedings against him;

(vi) manifest appropriate courtroom behavior; and

(vii) testify relevantly, if applicable;

(b) the impact of the mental disorder, or mental retardation, if any, on the nature and quality of the defendant's relationship with counsel;

(c) if psychoactive medication is currently being administered:

(i) whether the medication is necessary to maintain the defendant's competency; and

(ii) the effect of the medication, if any, on the defendant's demeanor and affect and ability to participate in the proceedings.

¶ 39 We first note that because defendant chose not to testify at trial, subsection 77–15–5(4)(a)(vii) was irrelevant. Similarly, because psychoactive medication was not being administered at the time, the experts were under no obligation to examine or discuss the factors mentioned under section 77–15–5(4)(c). However, the experts were required to "consider and address" the other factors in their reports to the court.

■ ¶ 40 After careful examination of the reports submitted to the trial court, we hold that any omission in the reports was harmless error. While the experts may not have used identical terminology to that set forth in the statute, their reports and testimonies at the competency hearing did in fact discuss each of the factors in the statute.

¶ 41 Specifically, we find that the written reports of Drs. Washburn, Golding, and Cohn clearly discussed all the factors set forth in section 77–15–5(4). Dr. Gardner's report, while less specific in its discussion of the statutory factors, set forth sufficient additional background to substantiate such determinations. Drs. Groesbeck and Howell did not submit written reports. However, they testified specifically, and to our satisfaction, as to each of these factors at the competency hearing. Drs. Wootton and Heinbecker, whose reports were less involved than some of the other experts', gave accompanying testimony at the competency hearing that specifically addressed any remaining factors absent from their reports. Additionally, the trial court had the benefit of years of reports, data, professional observations and opinions, prior judicial rulings concerning competency, medical and mental health records, psychiatric and psychological testing data, and lay observations and testimony.

¶ 42 Thus, while the written reports did not all address the factors specifically mentioned in section 77–15–5(4), we hold that in conjunction with the testimony offered at the competency hearing, all the statutory factors were considered and addressed by each expert. Although there may have been a violation of the statute, an erroneous decision by a trial court " 'cannot result in reversible error unless the error is harmful.' " *Robertson,* 932 P.2d at 1227 (quoting *Hamilton,* 827 P.2d at 240). Defendant has not been prejudiced.

4. Interviews as Bases for Evaluation

■ ¶ 43 Finally, defendant argues that the competency examinations based on interviews alone were insufficient to determine defendant's mental state and ability to stand trial. He contends that because of the shortened time frame, the alienists were not able to perform certain tests that might otherwise have been considered in the determination. However, the statute does not contain any requirements for an "examination." The statute simply states that the defendant "shall be examined by at least two mental heath experts." § 77–15–5(2)(b). Thus, we must determine the meaning of "examination" under our statute.

■ ¶ 44 When interpreting statutes, we first look to their plain language. *See Valcarce v. Fitzgerald,* 961 P.2d 305, 318 (Utah 1998); *Chris & Dick's Lumber & Hardware v. Tax Comm'n,* 791 P.2d 511, 514 (Utah 1990). To examine is to "determine the aptitude, qualifications, or skills of by questions or exercises," or "[t]o question formally." *Webster's II New College Dictionary* 390 (1995). In this case, defendant was interviewed and questioned formally. We hold that when defendant was interviewed by eight alienists, the statute requiring "examination" was fulfilled.

*B. Competency Determination*

■ ¶ 45 Defendant next contends that the trial court's finding that he was competent to stand trial was error. He asserts that the opinions offered by the State's expert witnesses were not supported by the evidence and were inconsistent with each other. A trial court's factual findings will not be overturned unless they are clearly erroneous. *See Lafferty I,* 749 P.2d at 1244; *State v. Woodland,* 945 P.2d 665, 667–68 (Utah 1997). We give deference to the trial court's factual findings because of its superior position to assess credibility. *See State v. Menzies,* 845 P.2d 220, 226–27 (Utah 1992) (*"Menzies I"*); *State v. Goodman,* 763 P.2d 786, 788 (Utah 1988). Defendant must "marshal the evidence in a light most favorable to the findings of the trial court and show that evidence to be insufficient." *Woodland,* 945 P.2d at 668.

■ ¶ 46 Defendant asserts there was adequate evidence to demonstrate he was suffering from mental illness at the time of the trial. Written and oral testimony was received to the effect that defendant believed in the presence of "travelers," or spirit beings that could inhabit living persons. He claimed that these travelers, homosexual in nature, had the power to exude evil and "invade people through the rear," and that these travelers had inhabited many people involved in his trial, including Judge Hansen, the prosecutors, his counsel, and the jurors and witnesses. Defendant contended that he was a good traveler trapped inside a physical body. He believed he was able to form a spiritual aura around himself, some sort of "reflector shield," that allowed him to defend himself from evil. He claimed he could discern the presence of travelers, that he had been attacked by them both physically and spiritually, and that he could use verbal and physical outbursts to nullify and confuse the evil they exude. He explained that acting out in court deflected the evil spirits. Defendant stated that he was involved in "spiritual warfare" against the powers of evil and claimed to have powers not possessed by normal persons to fight such evil.

¶ 47 After considering all evidence presented by the defense, and after the March 14 competency hearing, Judge Hansen handed down a detailed memorandum decision and thorough findings of fact regarding defendant's competency to stand trial. Having correctly applied the test for competency as it is set forth in *Dusky v. United States,* 362 U.S. 402, 80 S.Ct. 788, 4 L.Ed.2d 824 (1960)

(per curiam), and reiterated in *Lafferty II*, 949 F.2d at 1550, and after carefully considering the opinions of each of the eight expert witnesses, the trial court found that defendant was not delusional and did not at the time suffer from a mental illness that would prevent him from rationally participating in his defense. The court found that although defendant attached peculiar labels to his religious and political beliefs, his "ideas were developed through a rationally explained process" and "drawn from his real experiences in a reality based way."

¶ 48 In his memorandum decision, Judge Hansen addressed the testimony given by each expert, pointed to each opinion's strengths and weaknesses, and concluded that defendant was competent to stand trial. The court found Drs. Gardner, Golding, Cohn, and Wootton to be particularly persuasive. The State's experts supported their conclusions that defendant was competent to stand trial with specific examples drawn from their experiences with and interviews of him. They gave credible and persuasive explanations for defendant's beliefs and demonstrated convincingly how defendant's background and upbringing contributed to his current state. All of these experts testified that defendant was grounded in reality. Dr. Gardner was able to specifically help the court by addressing the competency standard as enunciated in *Lafferty II* and by providing examples in explaining his determination that defendant was competent. He testified many of defendant's beliefs could be explained by his religious background. He also testified that defendant became angry at times with the trial court or examiners because of specific ideas or expressions he found insulting or upsetting, not because of a mental disorder. Dr. Golding testified that defendant's outbursts in court were voluntary acts intended to disrupt testimony and evidence against him. He testified that defendant was aware of the proceedings against him and demonstrated abilities inconsistent with mental illness. Dr. Cohn testified that defendant demonstrated characteristics that are incompatible with a finding of psychosis and that defendant's beliefs and experiences were based in commonly held beliefs. Finally, Dr. Wootton testified that defendant's

beliefs, although extreme, had a basis in his religious upbringing. He testified that defendant's so-called delusional ideas were actually metaphors for rational thought processes. For example, defendant's in-court verbal outbursts, which he termed "reflector shields," were his way to disrupt perceived inaccuracies at trial.

¶ 49 Judge Hansen also stated his reasons for giving less credence to witnesses called by the defense. He pointed out that Dr. Groesbeck's and Dr. Washburn's opinions, though the most persuasive of the defense's experts, were conclusory and lacked sufficient analysis and detail to support their opinions. "A finder of fact, whether judge or jury, is free to reject diagnoses and conclusions that are not adequately explained." *Lafferty I*, 749 P.2d at 1245. In addition, Judge Hansen noted that Dr. Heinbecker could not determine whether defendant was malingering to avoid trial or was indeed delusional. He gave even less weight to Dr. Howell who, by his own admission, testified that at previous competency hearings specifically regarding defendant, he had testified and submitted written reports contrary to his own personal analysis and "caved in" to pressure from other examiners.

¶ 50 The court also stated its observations of defendant during the pretrial proceedings. Judge Hansen indicated that defendant was appropriate, polite, and cooperative during the competency hearings and that he was able to respond appropriately to various situations and events. The court noted, "He exhibits interpersonal relatedness, warmth, reason, linear thought, and a lively sense of humor."

¶ 51 Defendant's actions and ideas are no doubt extreme. However, "competency is established when a defendant can, but not necessarily will, assist or consult with counsel." *Woodland*, 945 P.2d at 668 (citing *Lafferty I*, 749 P.2d at 1243). We hold that there was ample evidence to support the trial court's finding of competency. We have carefully reviewed the arguments in defendant's brief, his motion in opposition to removing him from the courtroom, the testimony and written reports of the experts offered

at the competency hearings of March 8 and 14, 1996, and Judge Hansen's memorandum decision. While we do not set forth each of defendant's extensive assertions here, the trial court's findings were not clearly erroneous. *See* Utah R.Civ.P. 52(a). The fact that the findings of Judge Hansen in the 1996 competency hearing were different from those of Judge Ballif in the 1992 hearing does not undermine the 1996 competency determination.

## C. Motion for New Trial

¶ 52 Finally, defendant contends that denial of his motion for a new trial was error. On April 9, 1996, two weeks' into trial, defense counsel spoke with the court in chambers about an alleged deterioration in defendant's behavior. At that time, defense counsel elected not to seek court action, but decided to continue their efforts to keep defendant from prejudicing his case. However, after the verdict and penalty hearing, defendant moved for a new trial on the ground that he was incompetent during the trial. The motion was supported by affidavits of his counsel, paralegals and externs involved with the trial, and Dr. Breck J. Lebegue. The affidavits averred that defendant did not rationally understand the trial proceedings or appreciate the seriousness of his situation. Defendant's counsel stated in their brief:

> [Defendant] was not always attentive to what was going on in the courtroom, what the witnesses were relating nor did he evidence the demeanor of a person on trial for his life. To the contrary, the defendant often discussed mundane topics and religious concepts with those sitting next to him. He would at times focus on a particular thought and begin concentrating on writing some comment on a legal pad. Ofttimes these comments were unrelated to anything going on in the courtroom.

¶ 53 Defense counsel point to many specific incidents of peculiar behaviors they assert were probative of defendant's incompetency during trial. Defendant allegedly heard a buzzing sound and claimed that at times it prevented him from hearing what was going on in court; he suggested defense counsel bring a dog into the courtroom to detect the high-pitched noise. Defense counsel submitted that defendant would quickly forget discussions of legal issues and options and would have to be reminded repeatedly of the decisions before him. Counsel also submits that defendant's concept of double jeopardy prevented him from understanding that the court had jurisdiction to hear his case again. Similarly, counsel presented affidavits averring that defendant had to be distracted by a paralegal or an extern during trial to avoid inappropriate outbursts. In the opinion of his counsel, defendant was physically present in the courtroom but was not a part of the proceedings in any rational meaningful manner and did not assist his counsel in his defense.

¶ 54 Defendant asserts that under *Pate v. Robinson*, 383 U.S. 375, 86 S.Ct. 836, 15 L.Ed.2d 815 (1966), he had a due process right to a hearing to inquire into his competence when evidence of incompetency became manifest during trial. In order to trigger a new review of defendant's competency, there must be a bona fide doubt as to defendant's competency to stand trial. *See* § 77–15–5(1). " '[W]hen a competency hearing has already been held and defendant has been found competent to stand trial ... a trial court need not suspend proceedings to conduct a second competency hearing unless it is presented with a substantial change of circumstances or with new evidence casting a serious doubt on the validity of that finding.' " *People v. Kelly*, 1 Cal.4th 495, 3 Cal. Rptr.2d 677, 704, 822 P.2d 385, 412 (1992) (citation omitted). The decision to conduct yet another hearing is "in the sound discretion of the trial court" and depends on the "showing made, and the length of time elapsed from the prior psychiatric examination." *United States v. Cook*, 418 F.2d 321, 324 (9th Cir.1969). In *Drope v. Missouri*, 420 U.S. 162, 95 S.Ct. 896, 43 L.Ed.2d 103 (1975), the Supreme Court held that "evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required." *Id.* at 180, 95 S.Ct. 896.

¶ 55 After our own review of the affidavits offered in support of defendant's motion for a new trial, we conclude that the observations described in the affidavits do not raise new questions from those already determined in the March 1996 competency hearing prior to trial. The affidavits of Dr. Lebegue, defense counselors Michael D. Esplin and Linda Anderson, extern Krista Stone, and legal assistant Alicia G. Head failed to raise any new issues regarding defendant's competency. First, Dr. Lebegue did not observe defendant during trial. His observations were based on his review of transcripts, interviews with defense counsel, and an interview with defendant after the trial. The value of this type of retrospective evaluation of competency has been questioned by the Supreme Court. *See Dusky,* 362 U.S. at 403, 80 S.Ct. 788. Regardless, the types of behavior attested to in the affidavits were those previously discussed in the competency hearing: religious delusions, impaired concentration and ability to cooperate with counsel, irrational behavior, double jeopardy concerns, inability to prepare or present a defense, denial of evidence against him, the presence of travelers, inability to remember prior strategy discussions, auditory hallucinations, inappropriate emotional reactions, and a grandiose belief in his own personal power. We agree with the trial court that "these documents simply demonstrated that new people observed the same type of behavior already considered and ruled upon by the court."

¶ 56 Second, the trial court had considerable opportunity to observe defendant during jury voir dire and at trial. It observed that defendant consulted with counsel and reacted to statements of witnesses and other evidence presented. The guilt phase of the trial was completed within a month of the competency hearing. The trial court found that "[j]ust because Defendant confirmed the evidence some examiners concluded was indicative of mental illness, and which was considered at the competency hearing, [that] does not constitute new evidence that should have caused the Court to stay the proceedings to revisit the competency issue, nor does it now merit a new trial."

¶ 57 Section 77–15–5(1) requires that a competency hearing be held only when the court finds bona fide doubt as to a defendant's competency. That was not the case here. Defendant did not raise a bona fide doubt about his competency at any time during the trial after the initial competency hearing, or in his motion for a new trial. We therefore affirm the trial court's denial of defendant's motion for a new trial.

## II. CHALLENGE FOR CAUSE

¶ 58 Defendant next challenges the trial court's granting the State's challenge for cause of Juror 220. The law governing challenges for cause is rule 18(e)(10) of the Utah Rules of Criminal Procedure, which provides:

(e) The challenge for cause is an objection to a particular juror and may be taken on one or more of the following grounds:

. . .

(10) if the offense charged is punishable with death, the entertaining of such conscientious opinions about the death penalty as would preclude the juror from voting to impose the death penalty following conviction regardless of the facts.

Thus, the prosecution may challenge potential jurors who would be unable to impose the death penalty, *see State v. Young,* 853 P.2d 327, 387 n. 8 (Utah 1993) (citing *Witherspoon v. Illinois,* 391 U.S. 510, 513–14, 522 n. 21, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968); *Wainwright v. Witt,* 469 U.S. 412, 424, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985)), as well as those potential jurors whose "views would 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath,' " *Lockhart v. McCree,* 476 U.S. 162, 166 n. 1, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986) (quoting *Wainwright,* 469 U.S. at 433, 105 S.Ct. 844; *State v. Norton,* 675 P.2d 577, 589 (Utah 1983), *overruled on other grounds by State v. Hansen,* 734 P.2d 421 (Utah 1986)); *Adams v. Texas,* 448 U.S. 38, 45, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). We review the trial court's dismissal for cause under an abuse of discretion standard. *See State v. Archuleta,* 850 P.2d 1232, 1240 (Utah), *cert. denied,* 510 U.S. 979, 114 S.Ct. 476, 126 L.Ed.2d 427

(1993). We hold that the trial court did not abuse its discretion in striking Juror 220 for cause. In so holding, we look to the entire voir dire exchange with the challenged juror. *See Young,* 853 P.2d at 343.

¶ 59 First, we review Juror 220's written responses to the preliminary juror questionnaire. In the questionnaire, when asked whether she was willing to accept the law applicable to the case regardless of her personal feelings, Juror 220 replied that she could. She was then informed that if defendant was found guilty of first degree murder, he could be sentenced to life imprisonment or death. When asked whether she felt the penalty was too severe if defendant was in fact convicted, she responded, "No." When asked her feelings about the death penalty, she responded that "two wrongs [d]on't make a right" and that we "should not" have the death penalty. She indicated that if the State had met its burden, she could vote to impose the death sentence. Yet when asked her feelings about sitting on a jury that potentially would have to consider the death penalty, she wrote, "[I]t would be hard because what right [d]o I have to say the [g]uy [d]eserves [d]eath."

¶ 60 Juror 220 was examined further during voir dire. She stated:

> I don't know, I just don't like the death penalty. I am not saying it's right for someone to go kill anyone, or anything like that. But what's it going to prove, you know? . . . . What right do I have? You know, for anyone. I mean, it would be just like me, do I have the right to say anyone deserves to die today? I don't have that right.

The prosecutor then asked whether she could ever vote in favor of the death penalty if the State was able to prove beyond a reasonable doubt that the aggravating circumstances warranted it. She responded, "I don't think so." When asked if that was 100 percent of the time, she said, "100 percent, right now, yes."

¶ 61 The following exchange then took place between defense counsel and Juror 220:

> Q: [Y]our answers on the questions previously in the questionnaire, I think, would indicate a very open-minded and fair approach . . . in all regards, and I guess it's kind of unusual for me to be asking the questions I'm going to be asking here since I am a defense attorney, but what's important if you're so committed and so dug into a particular position that you just can't feel that you could be open minded about the any proposition, and in this particular case, obviously, it's going to be the imposition of the death penalty, or whether or not you could fairly keep an open mind and listen and judge the evidence that's presented to you and make a determination at that point in time? Do you think you could do that?
>
> A: I don't think so, because I am really deadlocked on it. I know I'm open minded and stuff like that, but the death penalty is—in my mind—is barbaric.
>
> . . . .
>
> Q: If you were to take a few minutes—it probably isn't a pleasant thought—is there a set of circumstances or facts that you could think of that would be just so heinous, so bad, so awful, whatever, that you could consider the imposition of the death penalty?
>
> A: Not unless a murder of my family member, possibly.
>
> . . . .
>
> Q: So when you said, in answer to Mr. Horton's question, that it was a 100 percent—
>
> A: Yeah.
>
> Q: [I]t's not really 100 percent?
>
> A: Yeah. Thinking about it, yeah, because if my son, or my brothers—I would have to look and weigh the evidence and stuff like that.

The prosecutor then questioned again:

> Q: I am trying to get at whether there are any other cases you could think of where you could fairly say you might impose the death penalty, or do you still think that you don't have the right to decide whether another person should die?
>
> A: On my part, no, I don't still have the right, you know; but if it was my son, you know, somebody else would have to be the jurors, but I don't think I could.

¶ 62 We believe Juror 220 clearly expressed her feelings that she could not impose the death penalty under any situation in which she would be qualified to sit as a juror.

¶ 63 We recognize that not all who oppose the death penalty are subject to removal for cause in capital cases. "[T]hose who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." *Lockhart,* 476 U.S. at 176, 106 S.Ct. 1758. Similarly, the Supreme Court in *Witherspoon,* 391 U.S. at 522 n. 21, 88 S.Ct. 1770 held that "veniremen . . . cannot be excluded for cause simply because they indicate that there are some kinds of cases in which they would refuse to recommend capital punishment. And a prospective juror cannot be expected to say in advance of trial whether he would in fact vote for the extreme penalty in the case before him."

¶ 64 However, that is not the case here. Because of Juror 220's refusal to impose the death penalty under any but the most narrow of circumstances, the trial court's decision to dismiss her for cause was not an abuse of discretion and was in fact in line with the policy enunciated in our case law. We therefore affirm the trial court's removal of Juror 220 from the jury venire.

## III. CONSTITUTIONALITY OF UTAH'S INSANITY DEFENSE

¶ 65 Defendant contends that Utah's insanity defense as set forth in section 76–2–305 of the Utah Code violates the cruel and unusual punishment provisions of the Eighth Amendment to the United States Constitution and article I, section 9 of the Utah Constitution. He asserts that as shown by the facts of this case, he suffered from a mental illness at the time of the offense. He contends that the illness impaired his capacity to appreciate the wrongfulness of his conduct and made him unable to distinguish between right and wrong or conform his conduct to the require-

ments of the law. At the close of the trial, the jury was given instructions regarding the defenses of insanity, diminished capacity, and guilty and mentally ill. The jury returned a verdict of guilty as charged on all counts, with no exception for mental illness.

¶ 66 The Utah insanity statute provides:

It is a . . . defense to a prosecution under any statute that the defendant, as a result of mental illness, lacked the mental state required as an element of the offense charged. Mental illness is not otherwise a defense.

Utah Code Ann. 76–2–305(1) (1995). This statute limits the insanity defense to negating the mens rea element of an offense necessary for conviction.[10] *See State v. Mace,* 921 P.2d 1372, 1376 (Utah 1996); *State v. Herrera,* 895 P.2d 359, 361–62 (Utah 1995) ("*Herrera I* "); *State v. Young,* 853 P.2d 327, 383 (Utah 1993). Whether a statutory scheme conforms with state and federal constitutional provisions is a question of law. *See State v. Herrera,* 1999 UT 64, ¶ 18, 993 P.2d 854 ("*Herrera II* "); *State v. Gardner,* 947 P.2d 630, 632 (Utah 1997) ("*Gardner III* "). Thus, we accord no deference to the trial court's rulings but review them for correctness. *See Herrera II,* 1999 UT 64 at ¶ 18, 993 P.2d 854; *Gardner III,* 947 P.2d at 632. Upon such a constitutional challenge, we will construe legislation to the extent possible as being in compliance with both the federal and state constitutions. *See Herrera II,* 1999 UT 64 at ¶ 18, 993 P.2d 854; *State v. Mohi,* 901 P.2d 991, 995 (Utah 1995); *Soc'y of Separationists, Inc. v. Whitehead,* 870 P.2d 916, 920 (Utah 1993). As we have stated:

"In assessing a punishment selected by a democratically elected legislature against the constitutional measure, we presume its validity. We may not require the legislature to select the least severe penalty possible so long as the penalty selected is not cruelly inhumane or disproportionate to the crime involved. And a heavy burden

10. Although this is not currently the state of the law, it was this version that was in effect at the time of the crime.

rests on those who would attack the judgment of the representatives of the people." *Andrews v. Morris,* 607 P.2d 816, 824 (Utah 1980) ("*Andrews I* ") (quoting *Gregg v. Georgia,* 428 U.S. 153, 175, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). Defendant challenges both the statute on its face and the statute's application to him.

### A. Fourteenth Amendment to the United States Constitution

¶ 67 Defendant contends that section 76–2–305 on its face and as applied to him violates federal due process and equal protection. To succeed on these claims, he must demonstrate that rights secured to him by the federal Due Process and Equal Protection Clauses have been violated by his conviction and sentence for the offenses at issue. *See Herrera II,* 1999 UT 64 at ¶ 20, 993 P.2d 854.

### 1. Due Process

¶ 68 The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend XIV, § 1. In challenging the application of the statute, defendant contends it is implicit in the concept of ordered liberty that criminal responsibility not be imposed on him for the murders when as a result of his mental illness at the time, he could not understand the wrongfulness of his conduct. We again cite our decision in *Herrera II,* where we clearly held that "there is no federal due process right to any particular insanity defense." 1999 UT 64 at ¶ 22, 993 P.2d 854 (citing *Herrera I,* 895 P.2d at 364). Defendant fails to specify "any constitutionally recognized liberty interest or other due process protection that secures to him the right to be found not guilty by reason of insanity" when a jury found he plotted and participated in the murders of Brenda and Erica Lafferty. *Id.* at ¶ 22, 895 P.2d 359. Thus, this claim fails.

¶ 69 Defendant next offers a facial challenge to the statute, contending that it allows persons who suffer from some degree of mental illness and diminished capacity, and who cannot appreciate the wrongfulness of their conduct and conform it to the requirements of the law, to be punished. However, we have held in the past that section 76–2–305, on its face, does not violate federal due process or equal protection. *See, e.g., Herrera II,* 1999 UT 64 at ¶ 19, 993 P.2d 854; *Herrera I,* 895 P.2d at 363–69. "States are free to recognize and define the insanity defense as they see fit." *Foucha v. Louisiana,* 504 U.S. 71, 96, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992) (Kennedy, J., dissenting on other grounds). We have consistently held that "the common law and our basic principles of ordered liberty are not offended by the mens rea model." *Herrera I,* 895 P.2d at 366 (citing *State v. Korell,* 213 Mont. 316, 690 P.2d 992, 1002 (1984)). We see no reason to alter our analysis of these issues, and we therefore hold that the trial court correctly denied these claims.

### 2. Equal Protection

¶ 70 The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution provides that no state shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. Thus, state laws must "treat similarly situated people alike unless a reasonable basis exists for treating them differently." *Herrera II,* 1999 UT 64 at ¶ 25, 993 P.2d 854; *Malan v. Lewis,* 693 P.2d 661, 669 (Utah 1984) (holding that "persons in different circumstances should not be treated as if their circumstances were the same").

¶ 71 Defendant, however, has failed to identify how the statute violates any fundamental right or makes determinations based on any suspect classification, nor can we determine any such violation as applied to defendant or on its face. A similar claim was made and rejected in *Herrera II.* We held there that section 76–2–305 need be only rationally related to a valid public purpose because Herrera could not identify any violation of a fundamental right or action based on a suspect classification. *See Herrera II,* 1999 UT 64 at ¶ 26, 993 P.2d 854. We noted in *Herrera II* that in enacting the statute governing the insanity defense, the legisla-

ture sought to "advance a valid public purpose, i.e., to limit the scope of the insanity defense and reduce the number of criminally culpable offenders avoiding criminal punishment." *Id.* at ¶ 27. We further held that the legislature acted reasonably when it drew a line between groups of offenders to achieve its stated purpose. *See id.* We see no reason to reject our prior reasoning; therefore, we deny defendant's equal protection claim under the Fourteenth Amendment.

### B. Eighth Amendment and Article I, Section 9 Prohibitions Against Cruel and Unusual Punishment

¶ 72 We next address defendant's assertion that section 77–2–305, both on its face and as applied to him, violates federal and state guarantees against cruel and unusual punishment because it allows for imposing punishment on mentally ill but not legally insane offenders. We will first address the constitutionality of the statute as it applies to defendant. This approach is consistent with our preference for examining the constraints of Utah's cruel and unusual punishment clause on a case-by-case basis. *See Mace,* 921 P.2d at 1376; *State v. Bishop,* 717 P.2d 261, 267 (Utah 1986) (*"Bishop I"*).

¶ 73 Defendant contends that the death sentence he received for two counts of murder is cruel and unusual as applied to him. Article I, section 9 of the Utah Constitution provides:

> Excessive bail shall not be required; excessive fines shall not be imposed; nor shall cruel and unusual punishments be inflicted. Persons arrested or imprisoned shall not be treated with unnecessary rigor.

We have held that the last sentence makes section 9 broader than its federal counterpart. *See Bishop I,* 717 P.2d at 267. Article I, section 9 is also a self-executing provision that prohibits specific evils that can be remedied without implementing legislation. *See Bott v. DeLand,* 922 P.2d 732, 737 (Utah 1996), *overruled in part on other grounds by Spackman v. Bd. of Educ. of Box Elder County Sch. Dist.,* 2000 UT 87, 16 P.3d 533. A criminal punishment is cruel and unusual under article I, section 9 if it is "so dispro-

portionate to the offense committed that it 'shock[s] the moral sense of all reasonable men as to what is right and proper under the circumstances.'" *Herrera II,* 1999 UT 64 at ¶ 33, 993 P.2d 854 (alteration in original) (quoting *Gardner III,* 947 P.2d at 633 (internal citation omitted)); *see also State v. Copeland,* 765 P.2d 1266, 1270 (Utah 1988).

¶ 74 The jury clearly found that defendant possessed the necessary mens rea when he plotted and participated in the murders of Brenda and Erica Lafferty. Therefore, he did not qualify for the defense of insanity under section 76–2–305. Defendant's own experts testified that even though they believed defendant was mentally ill at the time of the murders, he was capable of forming the requisite intent to kill, and that while his ability to control his actions may have been impaired, it was not nonexistent. We have also upheld the finding that defendant was competent to stand trial. Regardless, imposing punishment on one who is to some degree mentally ill but not legally insane is not cruel and unusual punishment.

> This court has already held that a defendant who does not qualify as legally insane under the Utah statutory scheme may be charged, tried, and convicted without offending state or federal due process and equal protection guarantees. It would be anomalous, if not irrational, for this court to hold ... that the legislature can constitutionally hold such defendants accountable for their criminal conduct but cannot constitutionally impose any punishment on such defendants.

*Mace,* 921 P.2d at 1377 (citation omitted). "[A]bsent a showing that a particular punishment is 'cruelly inhumane or disproportionate,' we are not apt to substitute our judgment for that of the legislature regarding the wisdom of a particular punishment or of an entire sentencing scheme." *Id.* at 1377–78 (citations omitted). *Mace* was decided under the Eighth Amendment, but applies with equal force to its state counterpart. *See Herrera II,* 1999 UT 64 at ¶ 38, 993 P.2d 854. Thus, an offender who acted with the required mens rea and was not legally insane at the time of the crime may be punished criminally unless the sentence itself is found

to be cruel and unusual. *See Mace,* 921 P.2d at 1377–78.

¶ 75 Defendant has failed to demonstrate that the punishment imposed on him is cruelly inhumane or disproportionate to the crimes committed. Defendant plotted the deaths of Brenda and Erica Lafferty, the wife and baby daughter of his younger brother Allen, and then participated in beating Brenda and slitting her throat to the spinal column, and in slitting the throat of Erica to the spinal column. The jury was allowed to consider all of defendant's defenses in contemplating the death penalty, including his assertions that he was mentally ill at the time of the offenses. We do not believe that defendant's sentence compared to the offense "shock[s] the moral sense of all reasonable men as to what is right and proper under the circumstances." *Copeland,* 765 P.2d at 1270. We therefore reject defendant's claim that the sentence he received constituted cruel and unusual punishment under article I, section 9 of the Utah Constitution.

¶ 76 Defendant next challenges the statute as applied to him under the Eighth Amendment to the United States Constitution. The Eighth Amendment, which applies to the states through the operation of the Fourteenth Amendment, provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. While the analytical framework of what constitutes cruel and unusual punishment under the Eighth Amendment continues to evolve, the underlying principle remains fundamentally the same: "[C]riminal punishments are prohibited if they are excessive or contravene evolving standards of decency and human dignity." *Herrera II,* 1999 UT 64 at ¶ 46, 993 P.2d 854; *see also Gardner III,* 947 P.2d at 649. "A criminal punishment may be cruel and unusual when it is barbaric, excessive, or disproportional to the offense committed." *Mace,* 921 P.2d at 1377 (footnote omitted).

¶ 77 We hold that the reasons already expressed for upholding defendant's sentence under article I, section 9 of the Utah Constitution support the same conclusion under the Eighth Amendment. Defendant's sentence is not cruelly inhumane, excessive, or disproportionate in any manner compared to the crimes he committed. As such, his Eighth Amendment claim fails as well.

¶ 78 Finally, defendant contends that section 77–2–305 on its face violates the Eighth Amendment and article I, section 9 of the Utah Constitution. A facial challenge can succeed, however, only when the statute at issue is incapable of any valid application. *See Herrera II,* 1999 UT 64 at ¶ 50, 993 P.2d 854; *Greenwood v. North Salt Lake,* 817 P.2d 816, 819 (Utah 1991). Because we have already upheld the validity of section 77–2–305 as applied to defendant, his facial challenge must fail a fortiori. *See Herrera II,* 1999 UT 64 at ¶ 50, 993 P.2d 854.

## IV. VICTIM IMPACT EVIDENCE

¶ 79 Defendant next contends that certain comments made by the prosecutor in his closing statements and the admission of a black and white videotape in the penalty phase depicting the crime scene and showing the body of Erica Lafferty were victim impact evidence and should have been excluded.

### A. *Videotape and Prosecutor's Statements as Victim Impact Evidence*

#### 1. Videotape

¶ 80 First, plaintiff contends that the admission of a videotape of the crime scene during the penalty phase of the trial showing the body of Erica Lafferty constituted victim impact evidence and should have been excluded under Utah Code Ann. § 76–3–207 (1995).[11] He asserts that because the videotape demonstrated the victim's youth and circumstances surrounding her death, it was victim impact evidence.[12] He charges that

---

**11.** Under the current statute, victim impact evidence is admissible at the penalty phase of a trial. *See* Utah Code Ann. § 76–3–207(2)(a)(iii) (1999). However, at the time of trial, victim impact evidence was inadmissible. Our review focuses on the law as it stood at the time of trial.

**12.** Although the body of Brenda Lafferty also appeared on the videotape, it is not alleged as error on appeal.

showing the videotape was an attempt to enrage and impassion the jury against him and was not, as the State contends, a mere showing of the crime scene. We disagree.

¶ 81 In *State v. Carter*, 888 P.2d 629 (Utah 1995), we stated that "victim impact evidence in capital cases applies to evidence of the victim's character, evidence of the effects of the crime on the surviving members of the family, and evidence of the surviving members' opinions of the crime." *Id.* at 653 (finding comments of a murder victim's husband about the impact of his wife's death on the family to be impermissible victim impact evidence); [13] *see also Booth v. Maryland*, 482 U.S. 496, 502, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), *overruled on other grounds by Payne v. Tennessee*, 501 U.S. 808, 830, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) (stating a victim impact statement "describe[s] the personal characteristics of the victims and the emotional impact of the crimes on the family ... set[ting] forth the family members' opinions and characterizations of the crimes and the defendant"). Our inquiry, then, is whether the videotape constituted victim impact evidence.

¶ 82 The videotape in question showed (1) the living room with various items strewn about the floor and blood splattered on the wall; (2) the kitchen floor with the phone receiver dangling by its cord, a pillow on the floor, and Brenda's body as it was found; and (3) Erica's body as it was found in her crib. The videotape was of poor quality and in black and white, with parts of the tape intentionally blacked out. The entire videotape takes one minute and forty-seven seconds to view. Of that, Brenda's body is visible for eleven seconds, and Erica's for ten seconds. The bodies are neither shown close up nor dwelt upon. The fatal wounds are not visible.

¶ 83 We hold the videotape does not fit the definition of victim impact evidence. It in no way speaks to the victim's character, effects of the crime on the surviving family, or any opinions of the surviving members about the crime. On the contrary, it accu-

rately and impartially portrays exactly what took place at the crime scene and is not unduly prejudicial. *See State v. Brown*, 607 P.2d 261, 266 (Utah 1980) (holding the court did not abuse its discretion by showing the jury a videotape of the crime scene). The videotape was demonstrative of the circumstances of the crime, of defendant's character, and of aggravating factors.

¶ 84 Section 76-3-207(2) clearly states that in sentencing proceedings, the defendant's character, background, history, mental and physical condition, and any other facts in aggravation or mitigation of the penalty are proper inquiries. The aggravating circumstance presented by the State was the fact that the homicide was committed "incident to one act, scheme, course of conduct, or criminal episode during which two or more persons are killed." Utah Code Ann. § 76-5-202(1)(b) (1995). Clearly, the videotape is probative of the fact that the murders were committed incident to one criminal episode and that two persons were killed. The State may introduce evidence that may incidentally convey some victim impact when such evidence is admissible for other permissible purposes. *See Carter*, 888 P.2d at 652 n. 37 (citing *Sermons v. State*, 262 Ga. 286, 417 S.E.2d 144, 146–47 (1992)). Thus, we hold that the videotape does not constitute victim impact evidence, but demonstrates other permissible factors and was properly admitted at trial.

2. Prosecutor's Statements During Closing Arguments

¶ 85 Similarly, defendant contends that certain comments made by the State in its rebuttal argument were "designed to bring to the attention of the jurors the impact of the crime on the victim, Erica Lafferty, in such a fashion as to have them focus, not on the character and history of the defendant, but upon the circumstances of the victim." The comments defendant asserts were improperly admitted are as follows:

---

13. In *Carter*, this court held that victim impact evidence was admissible for purposes of section 76–3–207(2). *See id.* at 653. The definition of victim impact evidence, however, has not changed.

Erica Lafferty, Brenda and Allen's daughter would have turned 13 years old this year; in fact, this month.... When baby Erica showed up on this man's death list it told you more about his character than all the witnesses, all the friends and acquaintances, all the experts that the defense called on his behalf. It demonstrated a blatant and callous disregard for life, for innocent human life. And if for no other reason, justice demands that Erica's murder result in punishment, too. If you determine that the defendant deserves life without parole before we even consider Erica lying dead in her crib, before we ever consider that the second person he killed was a 15–month–old infant, then there's only one punishment left that is meaningful, and that is death.

¶ 86 To prevail on this claim, defendant must demonstrate that the remarks " 'called to the jurors' attention matters which they would not be justified in considering in reaching a verdict.' " *State v. Bakalov*, 1999 UT 45, ¶ 56, 979 P.2d 799 (quoting *State v. Creviston*, 646 P.2d 750, 754 (Utah 1982)). We have stated that "[s]ome facts about the victim, including those pertaining to his or her personal characteristics, may inevitably come out at trial, especially where such evidence is 'probative of critical aspects of the trial.' " *Carter*, 888 P.2d at 652 n. 37 (citations omitted). The comments of the prosecutor did allude to some of Erica Lafferty's personal characteristics, such as Erica's age at the time of her death, how old she would have been at the time of trial, and that she died lying in her crib. The information does not, however, tell us about her character, the impact the death had on her family, or her family's opinions about the crime. Additionally, both of these details were already properly admitted at trial. A prosecutor has the right to draw inferences and use the information brought out at trial in his closing argument. *See Bakalov*, 1999 UT 45 at ¶ 56, 979 P.2d 799; *State v. Dunn*, 850 P.2d 1201, 1223 (Utah 1993). Thus, we hold that the prosecutor's comments did not constitute victim impact evidence.

¶ 87 However, even if these comments were to be seen as victim impact evidence, error requires reversal only if prejudicial. " 'An error is prejudicial only if we conclude that absent the error, there is a reasonable likelihood of a more favorable outcome for the defendant.' " *Carter*, 888 P.2d at 653 (quoting *Lafferty I*, 749 P.2d at 1255). In *Carter*, statements much more specific than those at hand, such as that the victim was " 'a very, very particular housekeeper, very good mother, and a very hard working, graceful wife,' " 888 P.2d at 650, as well as evidence that the victim's son was experiencing difficulties at school since the murder, *see id.*, were held to fall short of being prejudicial or unduly inflammatory, *see* 888 P.2d at 652. The comments in this case did not rise anywhere near the level of the comments in *Carter*. We therefore hold that the prosecutor's remarks did not constitute victim impact evidence.

### B. Procedural or Substantive Nature of Amendment to Utah Code Ann. § 76–3–207

¶ 88 Defendant next argues that the trial court erred in applying the 1995 version of section 76–3–207 of the Utah Code instead of the 1984 version. In general, section 76–3–207 outlines the evidence that may be presented at the penalty phase of a capital proceeding. Prior to 1995, the statute did not specifically address the issue of victim impact evidence. The 1995 version, however, allows for evidence of the victim's character and the impact of the crime on the victim's family and community. *See* Utah Code Ann. § 76–3–207(2)(a)(iii) (1995). The trial court held that the changes in the 1995 version were only procedural changes and therefore should have a retroactive effect. *See State v. Abeyta*, 852 P.2d 993, 995 (Utah 1993) (holding that while amendments to statutes are generally considered to take effect prospectively, there is an exception for amendments that are procedural or remedial in nature); *Smith v. Cook*, 803 P.2d 788, 792 (Utah 1990). Regardless, such a determination is unnecessary in this case because neither the videotape nor the prosecutor's statements constituted victim impact evidence.

## C. *Prosecutorial Misconduct in Violation of Stipulation*

¶ 89 Prior to the penalty phase of the trial, defendant requested that the State be prevented from presenting victim impact evidence of Erica's personal characteristics or testimony as to the effect of the murders on the surviving family. The State agreed that it would not call Allen Lafferty or any members of Brenda Lafferty's family to discuss the effect of the murders on the family or their opinions of the case. Defendant argues, however, that the rebuttal comments constituted impermissible victim impact evidence and were so prejudicial as to deny defendant due process of law. Since we held above that the prosecutor's statements during rebuttal did not constitute victim impact evidence, the only remaining issue is whether those comments were inflammatory and prejudicial, thus depriving defendant of a fair trial.

¶ 90 Although defendant failed to make contemporaneous objections to the prosecutor's allegedly improper comments, we have reviewed the record and find that the comments do not rise to the level of prosecutorial misconduct or warrant a reversal of defendant's conviction and sentence. As we stated in *Tillman II:*

> A prosecutor's actions and remarks constitute misconduct that merits reversal if the actions or remarks call to the attention of the jurors matters they would not be justified in considering in determining their verdict and, under the circumstances of the particular case, the error is substantial and prejudicial such that there is a reasonable likelihood that in its absence, there would have been a more favorable result for the defendant.

750 P.2d at 555; *see also State v. Knight,* 734 P.2d 913, 919 (Utah 1987); *State v. Tucker,* 727 P.2d 185, 187–88 (Utah 1986).

¶ 91 The specific comments defendant alleges were prejudicial were that Erica "would have turned 13 years old this year; in fact, this month" and that "[i]f you determine that the defendant deserves life without parole before we even consider Erica lying dead in her crib, before we ever consider that the second person he killed was a 15–month-old infant, then there's only one punishment left that is meaningful, and that is death."

¶ 92 We have difficulty understanding how this information could have prejudiced defendant. Merely repeating facts already brought out during trial in closing arguments is not prejudicial. " 'Counsel for both sides have considerable latitude in their [closing] arguments to the jury; they have a right to discuss fully from their standpoints the evidence and the inferences and deductions arising therefrom.' " *Lafferty I,* 749 P.2d at 1255 (quoting *State v. Valdez,* 30 Utah 2d 54, 60, 513 P.2d 422, 426 (1973)). The prosecutor's statements were merely reiterations of facts in evidence and inferences drawn from them and would not have changed the outcome of the trial.

¶ 93 While we have a duty to safeguard the trial process from evidence that is unduly inflammatory, we will not deny the jury relevant evidence of what actually happened. The victim was an infant, and that is relevant to the jury's sentence. The fact that Erica would have been thirteen-years old at the time of trial is easily discernible from the evidence presented at trial. The fact that she died lying in her crib is a fact, not prejudicial conjecture designed to inflame a jury. Thus, we hold the State did not commit prosecutorial misconduct or unduly inflame the jury through statements made during rebuttal.

## D. *Videotape and Prosecutor's Statements as Cruel and Unusual Punishment Under the Eighth Amendment*

¶ 94 Defendant finally contends that the videotape and the prosecutor's statements constitute cruel and unusual punishment under the Eighth Amendment to the United States Constitution and article I, section 9 of the constitution of the State of Utah because (1) the danger of inflaming the passions of the jury outweighed any relevant value; (2) the videotape was cumulative in light of the testimony of the police officers and the medical examiner; and (3) the only purpose for showing the videotape was to appeal to the passions of the jury and insure that defendant would receive the death pen-

alty because one of the victims was an infant. However, defendant fails to offer any case law, citations, or analysis beyond what has been mentioned above as to how the admission of the videotape or statements could be considered cruel and unusual punishment.

¶ 95 Rule 24 of the Utah Rules of Appellate Procedure provides that the brief of the appellant "shall contain the contentions and reasons of the appellant with respect to the issues presented, including the grounds for reviewing any issue not preserved in the trial court, with citations to the authorities, statutes, and parts of the record relied on." Utah R.App.P. 24(a)(9). Generally, a contemporaneous objection or some other form of preservation of a claimed error must be made part of the trial record before an appellate court can review such an error on appeal. *See Tillman I*, 750 P.2d at 551. " '[A] reviewing court is entitled to have the issues clearly defined with pertinent authority cited and is not simply a depository in which the appealing party may dump the burden of argument and research.' " *State v. Thomas*, 1999 UT 2, ¶ 11, 974 P.2d 269 (quoting *Bishop II*, 753 P.2d at 450). If the petitioner's brief does not comply with rule 24, it "may be disregarded or stricken, on motion or sua sponte by the court." Utah R.App.P. 24(j); *see also State v. Helmick*, 2000 UT 70, ¶ 7, 9 P.3d 164; *MacKay v. Hardy*, 973 P.2d 941, 948–49 (Utah 1998).

¶ 96 However, we review errors raised on appeal in death penalty cases, regardless of whether the error was objected to at trial or assigned as error on appeal. *See Tillman I*, 750 P.2d at 552. While doing so, "we do not abrogate a defendant's obligation or assume the role of an advocate by researching all applicable law and searching the entire record for each and every indication of possible or potential error." *Id.* To do so would impose an impossible burden on this court. Yet because of the grave and serious nature of the death penalty, we have the prerogative to correct sua sponte manifest and prejudicial errors not objected to at trial or assigned on appeal. *See id.*

¶ 97 We do not perceive how admission of this evidence could have violated state and federal constitutional protections against cru-

el and unusual punishment in any way. The admission of the videotape was not an issue of state or federal constitutional protection, but rather an issue of evidentiary admissibility, which we have addressed above. The only other possible constitutional argument we can conjecture is the constitutionality of the death penalty, which we address later in this opinion. Therefore, we hold that no state or federal constitutional violation has taken place because we see no plausible way the prosecutor's statements or the showing of the videotape could constitute cruel and unusual punishment.

## V.  STATEMENTS TO THE MEDIA

¶ 98 Defendant next challenges the admission of certain statements he made to the media. During the penalty phase, over the defense's objection, the prosecution was allowed to enter into evidence clips of two press conferences showing defendant and his brother Dan fielding questions from reporters about the crime. Defendant contends that the introduction of the clips constituted error because (1) the clips contained evidence of lack of remorse, which should not have been allowed without defendant first having offered evidence of remorse; (2) the clips were neither "relevant" nor "probative" of his *current* state of mind or of any other statutory factor upon which the jury could base its decision; (3) the clips were unduly prejudicial under rule 403 because they showed defendant in an orange jump suit and in custody of law enforcement officers; and (4) the jury may have found his attitude in the clips to be offensive. We review evidence admitted in the penalty phase of a trial for an abuse of discretion. *See State v. Carter*, 888 P.2d 629, 651 (Utah 1995).

### A.  *Evidence of Lack of Remorse*

¶ 99 First, defendant contends that his statements to the media should not have been admitted during the penalty phase because jurors could have interpreted his responses as lacking in remorse. Specifically, in a press conference held in September 1984, when asked whether he felt a great deal of remorse for his brother Allen, defen-

dant replied, "A great deal of remorse? I can't say that I feel a great deal of remorse for my brother Allen, no." A reporter continued, "Having just lost his wife and child, he's got to be in a lot of inner turmoil. Do you feel sorry for him?" Defendant replied, "Well, I have compassion for him, yes. He's my brother, I love him ... but life has to go on.... You can't stop. We all have tribulation in our lives, and it's unfortunate, but it's part of the process." In the same press conference, defendant stated he wanted to clarify that the removal revelation was not his "hit list." He states that the revelation "does not command anyone take the life of anyone." He stated that the revelation

> names certain individuals [among them Brenda and Erica Lafferty] ... those individuals God said were in some way holding up the work, and don't ask me to clarify it, because I don't know the end result of it. You'll have to get on your knees and ask God [Defendant laughs] if you want to know the answer to that, and that's all I can really say about it.

The other clip at issue was from an October 1984 press conference and shows defendant matter-of-factly stating that the removal revelation was not directed to him or to Dan and that it did not specifically say "kill," but rather "remove."

¶ 100 Defendant asserts that because he did not affirmatively offer any evidence of remorse, the prosecution should not have been allowed to present evidence to the contrary. He cites several California cases holding that remorse is a mitigating factor, *see* *People v. Davenport*, 11 Cal.4th 1171, 47 Cal.Rptr.2d 800, 829, 906 P.2d 1068, 1097 (1995); *People v. Crittenden*, 9 Cal.4th 83, 36 Cal.Rptr.2d 474, 512, 885 P.2d 887, 925 (1994); *see also People v. Dyer*, 45 Cal.3d 26, 246 Cal.Rptr. 209, 243, 753 P.2d 1, 35 (Cal. 1988), and that evidence of lack of remorse should not be allowed unless the defendant produces evidence of remorse.

¶ 101 However, Utah law allows the prosecution to admit evidence of lack of remorse. Section 76–3–207(2)(a) of the Utah Code provides that in capital sentencing proceedings, evidence may be presented as to the defendant's character as well as any other facts relevant to aggravation or mitigation of the penalty. *See* Utah Code Ann. § 76–3–207(2)(a)(ii), (iv) (1995). In *State v. Young*, we held that "[a] jury may legitimately consider a defendant's character, future dangerousness, *lack of remorse*, and retribution in the penalty phase hearing." 853 P.2d 327, 353 (Utah 1993) (emphasis added).

¶ 102 Second, defendant asserts that we should analogize rule 404(a)(1) of the Utah Rules of Evidence, which provides that character evidence may not be introduced by the prosecution except to rebut character evidence introduced by the defendant. However, section 76–3–207(2)(a) makes clear that a jury may legitimately consider the defendant's character during the penalty proceeding. *See* § 76–3–207(2)(a)(ii). Thus, rule 404(a)(1) is in no way applicable in this instance. The trial court did not abuse its discretion in admitting evidence of lack of remorse.

### B. Remoteness in Time

¶ 103 Defendant also takes issue with the videotape because it was made over twelve years before the second penalty hearing. Specifically, he argues that whether he felt or demonstrated a lack of remorse at the time of the news conference was not relevant to whether he felt remorse at the time the jury was considering the penalty. We disagree. A jury may consider remorsefulness at any stage of the events at issue or at any stage of trial. A sentencing jury's consideration is not restricted to factors that exist only at sentencing, but encompasses a range of factors in order to get as complete a picture of the defendant as possible, including his remorse. *See Young*, 853 P.2d at 353. Remorse expressed only at sentencing is highly suspect. *See State v. Galli*, 967 P.2d 930, 940 (Utah 1998) (Russon, J., concurring and dissenting). Thus, allowing the twelve-year-old videotape into evidence was not an abuse of discretion because of its remoteness in time.

### C. Applicability of Rule 403

¶ 104 Finally, defendant asserts that the videotape was prejudicial because it showed him surrounded by police officers and wear-

372

ing an orange jump suit. In addition, he argues that because some jurors may have found his comments to the media offensive, the videotape may have unduly influenced them. He contends that such evidence violated rule 403 of the Utah Rules of Evidence in that any probative value of the evidence was substantially outweighed by the danger of unfair prejudice.

¶ 105 The State properly points out, however, that evidence may be admissible during the penalty phase, even if excluded by the rules of evidence during the guilt phase. *See State v. Archuleta*, 850 P.2d 1232, 1246–47 (Utah 1993); *State v. Taylor*, 818 P.2d 1030, 1034 (Utah 1991). Section 76–3–207(2)(b) provides that *"[a]ny* evidence the court [considers] to have probative force may be received regardless of its admissibility under the exclusionary rules of evidence." (Emphasis added.) Thus, we will not overturn the trial court's determination of admissibility absent an abuse of discretion.

¶ 106 First, we hold that allowing the jury to see defendant in prison garb and surrounded by law enforcement officers was not unduly prejudicial or an abuse of discretion. We have repeatedly held that "it is a constitutional violation for a state to compel an *accused* to stand trial before a jury dressed in prison clothes." *State v. Kohl*, 2000 UT 35, ¶ 21, 999 P.2d 7; *State v. Bennett*, 2000 UT 34, ¶¶ 3–4, 999 P.2d 1; *Chess v. Smith*, 617 P.2d 341, 344 (Utah 1980). In *Chess*, we held that "[t]he prejudicial effect that flows from a defendant's appearing before a jury in identifiable prison garb is not measurable, and is so potentially prejudicial as to create a substantial risk of fundamental unfairness in a criminal trial." 617 P.2d at 344. However, it has not been alleged that defendant was compelled to stand trial in prison garb, only that a videotaped portion of a press conference showed him in such attire. We have never had occasion to determine whether such an inadvertent appearance could be a constitutional violation, and we need not reach such a determination here. We do not believe the short videotaped clip to be unduly prejudicial. At the time of the penalty phase, defendant had already been convicted once of six first degree felonies.

The jury was clearly aware that he was in custody. We do not believe such a showing was more prejudicial than probative.

¶ 107 Second, although some might have found defendant's comments and attitude in the clips to be offensive, defendant is calm and in control of his emotions. His conduct may have been interpreted as lacking remorse, but as we have held above, lack of remorse is a statutorily proper ground for admission of such evidence. *See Young*, 853 P.2d at 353 (holding a jury may consider lack of remorse in penalty phase). We cannot identify any other conduct in the clips that the jury may have found offensive. Therefore, the trial court did not abuse its discretion on either ground in showing the clips in the penalty phase.

## VI. JURY INSTRUCTION OF SYMPATHY OR MERCY

¶ 108 Lafferty next asserts that the trial court committed reversible error under the United States Constitution by refusing to give his requested jury instruction that the jury could consider sympathy or mercy arising from mitigating evidence in reaching its decision during the penalty phase. Prior to the penalty phase, defendant requested the following jury instruction:

> Your feelings of pity, mercy, or sympathy regarding the defendant are proper considerations in determining the penalty.

The trial court refused the instruction, even though the State did not object to its inclusion. The court instructed the jury during both the guilt and the penalty phase as follows:

> You are to be governed solely by the evidence introduced in this trial and the law as stated to you by me. The law forbids you to be governed by mere sentiment, conjecture, sympathy, passion, prejudice, public opinion or public feeling.

¶ 109 Defendant contends that the combination of the denial of the requested instruction at the penalty phase and the "no mercy" instruction given at the guilt phase prejudiced him by giving undue weight to issues of aggravation and disallowing mitigating fac-

tors such as sympathy, pity, and mercy. He argues that the lack of any mercy instruction violated his Eighth and Fourteenth Amendment rights under the United States Constitution.

¶ 110 This claim is clearly defeated by controlling Utah and United States Supreme Court precedent. In *State v. Young*, 853 P.2d 327 (Utah 1993), the court refused to give a similar jury instruction and charged the jury to base its verdict on the evidence produced in the penalty phase, not on sympathy or emotion. *See id.* at 362. We clearly held that while the federal constitution does not prohibit a "no mercy" instruction, neither does it require an instruction that the jurors *should* be guided by mercy or sympathy. *See id.* at 363. In that decision, we relied heavily on the reasoning of *Saffle v. Parks*, 494 U.S. 484, 110 S.Ct. 1257, 108 L.Ed.2d 415 (1990), which held that neither the Eighth nor the Fourteenth Amendment prevents the state "from attempting to ensure reliability and nonarbitrariness [of a death sentence] by requiring that the jury consider and give effect to the defendant's mitigating evidence in the form of a 'reasoned, *moral* response,' rather than an emotional one." *Id.* at 493, 110 S.Ct. 1257 (citation omitted). Similarly, the Supreme Court in *California v. Brown*, 479 U.S. 538, 107 S.Ct. 837, 93 L.Ed.2d 934 (1987), held that a "no mercy" instruction "serves the useful purpose of confining the jury's imposition of the death sentence by cautioning it against reliance on extraneous emotional factors." *Id.* at 543, 107 S.Ct. 837.

¶ 111 In support of his position, defendant points to *State v. Wood*, 648 P.2d 71 (Utah 1982), in which we held that "[t]o impose the death penalty, notwithstanding serious doubt as to its appropriateness, would create in some cases ... a substantial possibility of 'arbitrary ... treatment' and permit 'penalties which are [not] proportionate,' a result that is forbidden by the Legislature and that would raise issues of possible constitutional magnitude." *Id.* at 83 (citation omitted). However, in *Young*, we again held that nothing in *Wood* nor in Utah law entitles a defendant to make a general appeal to the jury's sympathy. *See Young*, 853 P.2d at 363. "The careful effort in the sentencing proceeding to

focus on evidence concerning the defendant's background, character, circumstances, and the nature of the crime committed is wasted if the jury is instructed to make a purely emotional decision instead of a reasoned response to the evidence presented." *Id.* at 364.

¶ 112 In this case, the "no mercy" instruction directed the jury to focus on the aggravating and mitigating evidence rather than on " 'mere sentiment, conjecture, sympathy, passion, prejudice, public opinion, or public feeling.' " *Id.* (citation omitted). We see no reason to reject strong federal and state precedent. We affirm the trial court's refusal to give a mercy instruction.

## VII. CONSTITUTIONALITY OF THE DEATH PENALTY STATUTE

¶ 113 Next, defendant argues that Utah's death penalty statute, Utah Code Ann. § 76–3–207 (1995), is unconstitutional under the Eighth Amendment and the Due Process Clause of the United States Constitution and article I, sections 7 and 9 and the due process clause of the Utah Constitution. We have stated and continue to believe, that the death penalty is "the most solemn and final act that the state can take against an individual." *State v. Wood*, 648 P.2d 71, 80 (Utah 1982). Because we recognize the extremely serious and sensitive nature of the death sentence, we have carefully and repeatedly considered challenges to its constitutionality. *See State v. Holland*, 777 P.2d 1019, 1026 (Utah 1989) (holding that in capital cases, we engage "in a 'comprehensive review' of the record for manifest or plain error" (citing *State v. Eldredge*, 773 P.2d 29, 34–35 (Utah 1989))), *overruled on other grounds by State v. Holland*, 921 P.2d 430 (1996). It is our duty to determine whether the " 'sentence resulted from prejudice or arbitrary action or was disproportionate.' " *Id.* (quoting *State v. Pierre*, 572 P.2d 1338, 1345 (Utah 1977) (*"Pierre I "*)); *see also Tillman I*, 750 P.2d 546, 553 (Utah 1987) (same); *Wood*, 648 P.2d at 77 (same). In this tradition, we review defendant's several claims with care and conclude that our death penalty scheme is in accordance with the United States Constitution as well as the Utah Constitution for the

reasons stated below. *See State v. Gardner*, 789 P.2d 273, 278–79 (Utah 1989) ("*Gardner I*") (listing cases where challenges to our sentencing scheme have been carefully considered and rejected in the past); *Bishop II*, 753 P.2d at 460 & n. 65 (same).

### A. Proportionality

¶ 114 Defendant first argues that the Utah death penalty statute violates the Eighth Amendment to the United States Constitution by not providing for appellate proportionality review of death sentences. While some states have chosen to provide it, proportionality review is not required under the federal constitution, *see Pulley v. Harris*, 465 U.S. 37, 40–50, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), or under our state constitution, *see State v. Carter*, 888 P.2d 629, 657 (Utah 1995); *Holland*, 777 P.2d at 1025–26; *Tillman I*, 750 P.2d at 562.

¶ 115 However, in *Holland*, we stated:

[T]his court has indicated that it will review death sentences for proportionality. In *Wood*, we stated: "In the penalty phase, it is our duty to determine whether the sentence of death resulted from error, prejudice or arbitrariness, or was disproportionate." However, we have made clear subsequently that neither this Court nor the trial courts need undertake a broad evidentiary inquiry into the variables that might affect when and under what circumstances juries throughout the state have imposed the death penalties.

Our statement in *Wood* about proportionality is, however, meaningful. It means that this Court will not allow sentencing authorities to impose the death penalty in an invidious fashion against particular types of persons or groups of persons or in a fashion disproportionate to the culpability in a particular case. The statement also means that over time, as this Court becomes aware of a general pattern in the imposition of the death penalty in this state, the Court may set aside death sentences that fall outside the general pattern and thus reflect an anomaly in the imposition of the death penalty. But that does not mean that a defendant is entitled

as a matter of course to determine how the sentencing scheme has been administered generally by trying to compare the facts and circumstances of capital cases on a case-by-case basis.

*Holland*, 777 P.2d at 1025–26 (citation omitted). Accordingly, we will review generally to prevent disproportionality. *See Tillman I*, 750 P.2d at 562; *Wood*, 648 P.2d at 77; *Pierre II*, 572 P.2d at 1345. We will not, however, conduct a case-by-case review. *See Pulley*, 465 U.S. at 40–50, 104 S.Ct. 871 (holding case-by-case proportionality review is not required under federal constitution); *Tillman I*, 750 P.2d at 562 (holding case-by-case proportionality review not required under Utah Constitution); *Andrews v. Morris*, 677 P.2d 81, 97 (Utah 1983) ("*Andrews II*") (same); *Pierre v. Morris*, 607 P.2d 812, 814 (Utah 1980) ("*Pierre II*")(same). Thus, we review defendant's claims for proportionality as provided in *Holland* for (1) whether the death penalty was imposed in an invidious fashion against a particular group of people; (2) whether the death penalty was proportionate to defendant's level of culpability; and (3) whether defendant's sentence was in proportion to the general pattern of cases in our state. *See Holland*, 777 P.2d at 1025–26.

### 1. Imposition Against Particular Groups

¶ 116 Defendant first contends that under *Gardner III*, imposing the death penalty on a group of persons who are mentally ill and unable to understand their actions at the time of the commission of the offense is cruel and unusual punishment. *See* 947 P.2d at 639–40 (holding that this court may review sentences for proportionality with level of culpability). We need not reach this issue, however, because defendant has no standing to bring such a claim. While defendant did offer some evidence of mental illness before the trial court, there was significant evidence to the contrary. There was no determination that defendant was in fact mentally ill at the time of the murders or at the time of trial. Neither was defendant found to be legally insane under section 76–2–305 of the Utah Code. Defendant was found guilty with no qualifier of mental illness. Without such a finding from the court below, and in light of

ample evidence to the contrary, we reject the claim that defendant was part of a group of individuals sentenced to death although mentally ill at the time they committed their crime.

## 2. Level of Culpability

¶ 117 Defendant next contends that his sentence was disproportionate to his level of culpability. He asserts that because his brother Dan testified at trial to physically committing both murders, the level of his own culpability is that of an accomplice and he should have been sentenced in proportion to other accomplices instead of as a principal actor. He argues that under these circumstances, his culpability is not proportionate to his sentence.

¶ 118 However, this view of the evidence is one-sided. Chip Carnes testified that in the car directly after the murders, defendant confessed to committing the murder of Brenda himself. There is ample evidence to support the jury's verdict of guilty of two counts of aggravated murder—that defendant committed at least one of the murders with his own hands and masterminded the scheme that resulted in the deaths of both Brenda and Erica Lafferty. Defendant was not sentenced as an accomplice, but as the perpetrator of the murders. This level of culpability is clearly sufficient to warrant the death penalty. We therefore hold that under the jury's findings and the clear weight of the evidence, defendant's culpability in the crime was not disproportionate to his death sentence.

## 3. General Pattern of the Imposition of the Death Penalty

¶ 119 Third, defendant argues that his sentence is not proportionate to the general sentencing pattern in Utah and thus reflects an anomaly in the imposition of the death penalty in our state. Specifically, he points to *Holland*, where we stated that "[w]ith few exceptions, juries in this state have not opted for death penalties when a defendant has committed only a single murder; for the most part death penalties have been imposed when the defendant was involved in multiple murders, either at the time

of the particular homicide charged or at some other time." *Holland*, 777 P.2d at 1026.

¶ 120 Again, defendant's argument rests on a contorted view of the evidence presented at trial; namely, that he did not commit any of the murders. We have already held that such a characterization of the evidence is misleading. The jury found defendant guilty of two counts of aggravated murder with ample evidence to support such a conclusion. The death penalty has been imposed in our state for cases involving two murders. *See, e.g., State v. Taylor*, 947 P.2d 681 (Utah 1997) (two counts of first degree murder).

¶ 121 Regardless, even had the jury not found defendant guilty on two counts of aggravated murder, his sentence would not conflict with the general sentencing pattern in our state. We have repeatedly upheld the imposition of the death penalty in cases of one first degree murder conviction. *See State v. Lovell*, 1999 UT 40, 984 P.2d 382 (one count each of first degree murder, aggravated kidnaping, and aggravated burglary); *Menzies II*, 889 P.2d 393 (one count each of first degree murder and aggravated kidnaping); *Carter*, 888 P.2d 629 (one count of first degree murder); *Gardner v. Holden*, 888 P.2d 608 (Utah 1994) ("*Gardner II*") (one count each of first degree murder, attempted first degree murder, and aggravated kidnaping); *Parsons v. Barnes*, 871 P.2d 516 (Utah 1994) (one count each of first degree murder, aggravated robbery, and theft); *Tillman v. Cook*, 855 P.2d 211 (Utah 1993) ("*Tillman II*") (one count of first degree murder); *State v. Archuleta*, 850 P.2d 1232 (Utah 1993) (one count of first degree murder); *State v. Taylor*, 818 P.2d 1030 (Utah 1991) (one count each of first degree murder and sexual assault of a child). Thus, defendant's sentence is proportionate to others recorded in our case law and does not present any evidence of an anomaly of justice. Our duty to review for proportionality in the general pattern of cases, as required by *Wood* and *Holland*, is therefore met.

¶ 122 Finally, defendant argues that his death sentence is not proportionate when compared with the sentence of his brother Dan. Dan was convicted of identical capital

homicide counts, as well as other first degree felony counts, yet was sentenced to life in prison. We reject such an argument and repeat that case-by-case proportionality review is not required under the United States or Utah Constitution. *See Tillman I*, 750 P.2d at 562 (citing generally *Pulley*, 465 U.S. 37, 104 S.Ct. 871, 79 L.Ed.2d 29; *Andrews II*, 677 P.2d at 97; and *Pierre II*, 607 P.2d 812).

¶ 123 Defendant and his brother Dan were tried before different juries, were represented by different counsel, and had different aggravating and mitigating factors presented on their behalf. In *Gardner I*, we held that our proportionality review focuses

> on the individual defendant and his [or her] acts ... not comparison with other criminals and their crimes. Each defendant is an individual, and each case is unique in its facts. Any attempt to draw broad comparisons between defendants or crimes calls for speculation as to why a particular defendant or crime was dealt with by that jury in that particular fashion. The many factors which may influence a jury's decision cannot be easily identified, let alone quantified.

789 P.2d at 287.

¶ 124 We have declined to engage in comparative proportionality review in the past, and we will not here conduct a case-by-case comparison of defendant's sentence with other similar cases, whether that of Dan Lafferty or others, to determine whether the death penalty was properly imposed.

### B. State and Federal Due Process

¶ 125 Defendant next asserts that his constitutional due process rights were violated because the sentencing jury was allowed to consider as aggravating factors the evidence that established the crime in the guilt phase. First, he argues the admission of such evidence improperly shifts the burden to a defendant to overcome evidence of conviction. He further contends that if neither side chose to produce any evidence at the penalty phase, the death penalty would be imposed automatically, or "simply by means of the conviction of guilt." Second, defendant asserts that our sentencing scheme does not provide adequate standards to ensure meaningful review.

1. Burden Shifting

¶ 126 First, under Utah's capital sentencing statute, consideration of guilt-phase aggravators is permissible during the penalty phase. Section 76–5–202(1) of the Utah Code enumerates several aggravating elements that may elevate a homicide from second to first degree or aggravated murder during the guilt phase of the trial. Once a defendant has been found guilty of a capital felony, the case then goes to a sentencing phase where the aggravating circumstances found in the guilt phase may be considered. *See* Utah Code Ann. § 76–3–207(1), (3) (1995).

¶ 127 Both this court and the United States Supreme Court have held that the consideration of aggravating circumstances in both the guilt phase and the penalty phase of a trial does not de facto shift the burden of proof to the defendant or render the sentencing scheme unconstitutional. *See Lowenfield v. Phelps*, 484 U.S. 231, 246, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988); *Parsons*, 871 P.2d at 528; *Bishop II*, 753 P.2d at 460. As the State argues in its briefs, a defendant is simply given an opportunity to present additional, less obvious mitigation evidence if he so chooses. The burden of proof is never shifted to the defendant. Additionally, just as aggravating factors from the guilt phase of the trial may be considered at the penalty phase, so may any mitigating evidence or factors presented in the case-in-chief. For example, the youth of the offender would be obvious from evidence adduced at trial, as well as whether a defendant was impaired as a result of mental or emotional disturbance, intoxication or drugs, or whether a defendant acted under duress or pressure from another-all these are proper mitigating circumstances under section 76–3–207.

¶ 128 Finally, under our sentencing scheme, conviction does not mean the automatic imposition of the death penalty. Before the death penalty may be imposed, a jury must determine beyond a reasonable doubt that (1) the aggravating factors in

their totality outweigh the mitigating factors in their totality, and (2) the imposition of the death penalty is justified and appropriate under the circumstances. *See Wood*, 648 P.2d at 83 (citing *State v. Wood*, 648 P.2d 71, 71 (Utah 1981) (per curiam)); *Holland*, 777 P.2d at 1025. Then, having weighed *all* the circumstances, the jury may choose to impose the death penalty. Such a punishment is never mandated or imposed automatically, regardless of whether evidence is offered in mitigation. The burden never shifts to the defendant. Any such claim, then, must fail.

### 2. Meaningful Review

¶ 129 Defendant next asserts that our sentencing scheme fails to provide standards to ensure meaningful review of the penalty phase. He argues that because formal findings of fact are not required at the penalty phase, there is no chance for meaningful review.

¶ 130 In *Wood*, we held the standard for the fact finder to follow in the sentencing phase of a capital case to be

> "After considering the totality of the aggravating and mitigating circumstances, you must be persuaded beyond a reasonable doubt that total aggravation outweighs total mitigation, and you must further be persuaded, beyond a reasonable doubt, that the imposition of the death penalty is justified and appropriate in the circumstances."

648 P.2d at 83 (quoting *Wood*, 648 P.2d at 71 (per curiam)). Thus, there is a clear two-pronged test the jury must meet before imposing the death penalty. Section 76–3–207(3) provides the standard of review on appeal:

> Upon any appeal by the defendant where the sentence is of death, the supreme court, if it finds *prejudicial error* in the sentencing proceeding only, may set aside the sentence of death and remand the case to the trial court for new sentencing proceedings to the extent necessary to correct the error or errors.

(Emphasis added.) Concrete standards exist both for the imposition of the death penalty and for a review to guard against the arbitrary or capricious administration of it. We held this to be the case in *Pierre II* where we stated that "[u]nder these procedures our statutes are not constitutionally vulnerable." 572 P.2d at 1345; *see also Wood*, 648 P.2d at 83–84. We see no need to deviate from that holding here.

### C. Eighth Amendment

¶ 131 Defendant next contends that the addition of new aggravating factors to section 76–5–202 makes the section impermissibly broad and allows for prosecutorial abuse and for similar defendants to be treated differently. Further, he argues that section 76–3–207(2) impermissibly broadens the category of aggravating factors that may be considered when deliberating the imposition of the death penalty. We reject both assertions.

### 1. Section 76–5–202

¶ 132 Since its original enactment, section 76–5–202, which provides the circumstances under which the death penalty can be imposed, has been broadened by amendment. Defendant specifically points to section 76–5–202(1), which widened the class of defendants eligible to receive the death penalty to include those convicted of homicide while engaged in the commission, attempt, or flight after the commission or attempt to commit forcible sexual and aggravated sexual abuse of a child. *See* Utah Code Ann. § 76–5–202(1)(d) (1999). He argues that such a widening of the scope of potential death penalty circumstances will allow for prosecutorial misconduct and result in a greater chance that the penalty will not be imposed uniformly and equally—that the decision as to whether to charge a defendant with a capital crime has become arbitrary.

¶ 133 Regardless, we need not make such a determination here. The amendment defendant objects to as being overly broad was enacted in 1996, after defendant was sentenced, and had no effect on the penalty phase. " '[A]n amendment to [a] statute passed after sentence has no effect on the matter.' " *Smith v. Cook*, 803 P.2d 788, 792–93 (Utah 1990) (quoting *Harris v. Smith*, 541 P.2d 343, 344 (Utah 1975)). Consequently, defendant's challenge fails.

### 2. Section 76–3–207(2)

¶ 134 In addition, defendant contends that section 76–3–207(2), which allows the State to introduce *any* evidence of aggravation in a capital case, broadens rather than narrows the class of defendants subject to the death penalty in violation of *Lowenfield,* which held that aggravating factors in a death penalty scheme are to be a means of "genuinely narrowing the class of death-eligible persons." 484 U.S. at 244, 108 S.Ct. 546. Specifically, defendant argues that admitting evidence of (1) lack of remorse and (2) what he asserts was victim impact evidence was impermissible. Since we have already held above that both items of evidence were properly admissible, we also reject the general argument that the death penalty scheme is unconstitutional for a lack of narrowing the class of death-eligible persons. As we held in *State v. Young,* so long as the initial narrowing of death-eligible defendants occurs at the guilt phase, as it does in Utah, the use of additional aggravating factors during the penalty phase is constitutional. *See* 853 P.2d 327, 352 (Utah 1993).

### D. *Fourteen Years on Death Row as Federal Cruel and Unusual Punishment Violation and State Due Process Violation*

### 1. Federal Cruel and Unusual Punishment Considerations

¶ 135 Defendant next argues that executing him, after he has spent fourteen years on death row, would violate his federal constitutional rights against cruel and unusual punishment. Convicted in 1985, defendant has spent the last fourteen years on death row in maximum security at the Utah State Prison, minus fourteen months at the Utah State Hospital and two years in custody at the Utah County Jail. Defendant bases his argument on the Supreme Court's decision in *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), where the Court stated that the two principal social purposes served by the death penalty are retribution and deterrence. *See* 482 U.S. at 183, 107 S.Ct. 2312. Defendant asserts that neither of those purposes can now be served because he has been on death row for such an extended period of time. He argues that imposing the sentence without fulfilling the purposes outlined by the Supreme Court would result in the "gratuitous infliction of suffering" and would constitute cruel and unusual punishment. *See id.*

¶ 136 However, the Supreme Court has recently denied petitions for writs of certiorari involving similar Eighth Amendment challenges to the imposition of the death penalty in cases where the defendants were on death row for twenty years or more. *See State v. Moore,* 256 Neb. 553, 591 N.W.2d 86, 93–95 , *cert. denied,* 528 U.S. 990, 120 S.Ct. 459, 145 L.Ed.2d 370 (1999), *overruled in part on other grounds by Nebraska v. Reeves,* 258 Neb. 511, 604 N.W.2d 151 (2000); *Knight v. State,* 746 So.2d 423, 437 (Fla. 1998), *cert. denied,* 528 U.S. 990, 120 S.Ct. 459, 145 L.Ed.2d 370 (1999). In denying certiorari in *Knight v. Florida,* Justice Thomas stated that there is no "support in the American constitutional tradition or in [the Supreme] Court's precedent for the proposition that a defendant can avail himself of the panoply of appellate and collateral procedures and then complain when his execution is delayed." 528 U.S. at 990, 120 S.Ct. 459 (Thomas, J., concurring). Defendant presents no new support that persuades us to hold any differently. Thus, we deny defendant's claim for violation of his federal protections against cruel and unusual punishment.

### 2. State Cruel and Unusual Punishment and Due Process Considerations

#### a. Article I, Section 9

¶ 137 Article I, section 9 of the Utah Constitution provides that "[e]xcessive bail shall not be required; excessive fines shall not be imposed; nor shall cruel and unusual punishments be inflicted. Persons arrested or imprisoned shall not be treated with unnecessary rigor." Defendant argues that execution after fourteen years of incarceration is cruel and unusual punishment. We disagree.

¶ 138 In *State v. Andrews,* 843 P.2d 1027 (Utah 1992) ("*Andrews III* "), we reasoned that execution after a lapse of eighteen years following conviction did not constitute cruel and unusual punishment under either the

Eighth Amendment to the United States Constitution or article I, section 9 of the Utah Constitution. *See id.* at 1030. *Andrews III* provides the standard to be used in determining whether a penalty constitutes cruel and unusual punishment, which is " 'whether the sentence imposed in proportion to the offense committed is such as to shock the moral sense of all reasonable men as to what is right and proper under the circumstances.' " *Id.* at 1030 & n. 20 (quoting *State v. Bastian,* 765 P.2d 902, 904 (Utah 1988)); *see also State v. Hanson,* 627 P.2d 53, 56 (Utah 1981).

¶ 139 Under this standard, we hold that fourteen years in detention followed by the death penalty is not cruel and unusual or inappropriate under the circumstances. Defendant was convicted of participating in brutally beating, strangling, and slitting the throats of a young woman and her infant child. The imposition of the death sentence is not so out of proportion with the crime as to shock the moral sense of all reasonable men. Accordingly, article I, section 9 is not violated.

b. Article I, Section 7

■ ¶ 140 Article I, section 7 of the Utah Constitution provides, "No person shall be deprived of life, liberty or property, without due process of law." Defendant asserts that failure to provide specific objective standards to review prosecutors' discretion in filing death penalty charges, as well as failure to provide standards for juries to follow in imposing the death penalty, amounts to cruel and unusual punishment and unnecessary rigor under the statute. We also find this contention unavailing.

■ ¶ 141 We have repeatedly considered and upheld the constitutionality of the death penalty scheme, holding that it allows neither too much prosecutorial discretion nor unguided prosecutorial discretion in determining to seek the death penalty. *See Holland,* 777 P.2d at 1024–25; *Tillman I,* 750 P.2d at 562, 572 (rejecting a broad claim of disproportionality including an assertion of specific prosecutorial abuse in charging a capital offense); *Wood,* 648 P.2d at 81–83; *see also State v. Brown,* 607 P.2d 261, 268–71 (Utah 1980)

(upholding constitutionality of Utah's death penalty scheme); *Gregg,* 428 U.S. at 199, 224–26, 96 S.Ct. 2909 (Stewart, J., plurality and White, J., concurring); *Proffitt v. Florida,* 428 U.S. 242, 254, 261, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) (White, J., concurring). Defendant bears the heavy burden of convincing this court to depart from controlling precedent. *See State v. Arguelles,* 921 P.2d 439, 443 (Utah 1996). Defendant makes no argument that meets that burden.

## VIII. CONSTITUTIONALITY OF RETRIAL

¶ 142 Finally, defendant contends that having to stand trial a second time violates the double jeopardy provision of the Fifth Amendment to the United States Constitution and article I, section 12 of the Utah Constitution. He asserts two points of error for our consideration: (1) that the reversible error that occurred in the first trial was an error of the court on a point not actively challenged by defendant at trial and therefore jeopardy should have attached then; and (2) that the prosecutor wrongfully withheld one expert's opinion finding defendant incompetent to stand trial, arguing that such information might have resulted in a different ruling on the competency issue. Defendant argues that in light of these alleged errors, his convictions and sentences should be reversed.

¶ 143 The Fifth Amendment to the United States Constitution states that no person shall "be subject for the same offense to be twice put in jeopardy of life or limb." Similarly, article I, section 12 of the Utah Constitution states that no "person [shall] be twice put in jeopardy for the same offense." We have held that this constitutional guarantee against double jeopardy affords a criminal defendant three separate protections: (1) protection against a second prosecution for the same offense after acquittal; (2) protection against a second prosecution for the same offense after conviction; and (3) protection against multiple punishments for the same crime. *See State v. Trafny,* 799 P.2d 704, 709 (Utah 1990); *State v. Holland,* 777 P.2d 1019, 1023 (1989), *reversed on other*

*grounds by State v. Holland,* 921 P.2d 430 (Utah 1996).

¶ 144 Defendant charges that he was prosecuted in violation of the second protection, or protection against a second prosecution after conviction. He contends that retrial was necessary because of an error on behalf of the trial court and because of prosecutorial misconduct. He contends the errors were not committed by him and consequently jeopardy should have attached with his first conviction. We disagree.

### A. Error of the Court

¶ 145 Defendant first argues that his retrial violated protections against double jeopardy because the trial court erred by applying an inappropriate standard for determining competency at his first hearing. Regardless, we have held that "double jeopardy does not generally bar a second trial when a conviction was successfully vacated on appeal or by motion for a new trial based on errors in the first." *State v. Rudolph,* 970 P.2d 1221, 1230–31 (Utah 1998) (citing *United States v. Tateo,* 377 U.S. 463, 465, 84 S.Ct. 1587, 12 L.Ed.2d 448 (1964)); *see also McNair v. Hayward,* 666 P.2d 321, 323 (Utah 1983). Similarly, section 76–1–405 of the Utah Code provides that "[a] subsequent prosecution for an offense shall not be barred ... [when t]he former prosecution result[s] in a judgment of guilt [and is] held invalid in a subsequent proceeding on writ of habeas corpus...." Utah Code Ann. § 76–1–405 (1995). That is the case here. The Tenth Circuit vacated the conviction of the first trial court on the ground that the court had failed to apply the proper standard in determining competency. *See Lafferty II,* 949 F.2d 1546, 1556 (10th Cir.1991). Retrying a case when a "trial error" has occurred does not place the defendant in double jeopardy. *See State v. Lopes,* 1999 UT 24, ¶ 21, 980 P.2d 191; *State v. Higginbotham,* 917 P.2d 545, 550–51 (Utah 1996). Retrial was proper on this ground alone, regardless of the prosecutorial misconduct, and neither the State nor defendant should be denied the right to a fair, error-free determination; " 'the double jeopardy clause may not deny either side that right.' " *Lopes,* 1999 UT 24 at ¶ 21, 993

P.2d 854 (quoting *State v. Lamorie,* 610 P.2d 342, 347 (Utah 1980)).

¶ 146 We note that defendant would have us completely ignore the fact that his conviction was reversed as a direct result of his appellate challenges. However, as he states in his brief, "Defendant, after denial of the automatic appeal by the Utah Supreme Court, filed a writ of habeas corpus in the federal system, resulting in a finding that the trial judge had committed error failing to apply the correct standard of competency at the competency hearings." " 'Where the defendant has complained of errors that vitiate the prior proceedings and judgment and they are nullified at his request, he cannot then take the inconsistent position that there was a valid proceeding and judgment against him which constitute a former jeopardy.' " *McNair,* 666 P.2d at 323 (quoting *State v. Jaramillo,* 25 Utah 2d 328, 329, 481 P.2d 394, 395 (1971)); *see also State v. Kessler,* 15 Utah 142, 145–46, 49 P. 293, 294–95 (1897); 21 Am.Jur.2d *Criminal Law* § 309 (1970) ("Where a defendant obtains a reversal of a conviction grounded on a trial court's error in the proceedings, the double jeopardy clause does not preclude retrial of him."). Thus, defendant's contention that double jeopardy protection should have been afforded him fails on this ground.

### B. Prosecutorial Misconduct

¶ 147 Next, defendant argues that bad faith on the part of the prosecutor, who withheld exculpatory information, should invoke double jeopardy protection. Prosecutors have a duty under both the Utah and United States Constitutions to disclose material, exculpatory evidence to the defense. *See State v. Bakalov,* 1999 UT 45, ¶ 30, 979 P.2d 799. At the first trial, the court appointed several alienists who examined defendant and testified about his ability to proceed to trial. The State independently employed two additional experts, Dr. Thorne and Dr. Lebegue. The prosecution informed the court and opposing counsel of Dr. Thorne's opinion only, who testified that defendant was competent to stand trial. The opinion of Dr. Lebegue, who reached a contrary determination, was not revealed, even

though defendant moved for discovery of all exculpatory evidence. The court proceeded, unaware of Dr. Lebegue's opinion, and determined that defendant was competent to stand trial. Defendant argues that the court may not have proceeded to try defendant if it had been privy to Dr. Lebegue's opinion, and that retrying him after the prosecution failed to produce such exculpatory evidence should invoke double jeopardy protection.

¶ 148 Defendant cites *McNair* in support of his position. In that case, the prosecutor allowed the jury to commence its deliberations on the basis of sworn testimony that the prosecutor knew to be false. *See McNair*, 666 P.2d at 326. The court held that because a conviction would have been reversed on appeal for insufficient evidence, retrying the case would place the defendant in double jeopardy; it therefore ordered the defendant discharged from custody. *See id.* at 327.[14] Thus, *McNair* was decided on the basis of insufficiency of the evidence, not prosecutorial misconduct, and is not applicable to the case at hand.

¶ 149 We have, however, held that double jeopardy can bar retrial for some types of prosecutorial misconduct. It can bar retrial where a judge or prosecutor acts in bad faith with the intent to provoke a mistrial in order to provide the prosecution with a more favorable opportunity to convict. *See Trafny*, 799 P.2d at 709; *State v. Jones*, 645 P.2d 656, 656–57 (Utah 1982); *State v. Ambrose*, 598 P.2d 354, 357 n. 8 (Utah 1979). While a prosecutor has a constitutional duty to volunteer obviously exculpatory evidence that is "so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce," *United States v. Agurs*, 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), the remedy for such a trial error is a new trial, and retrial to correct such error does not violate the Double Jeopardy Clause. *See Burks v. United States*, 437 U.S. 1, 15, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978) (stating that prosecutorial misconduct constituted trial error, which could be remedied by new trial); *Lamorie,*

610 P.2d at 347 (same); *State v. Jarrell*, 608 P.2d 218, 224–25 (Utah 1980) (implying that prosecutor's withholding of exculpatory information could be remedied by new trial). Defendant received a new trial. Hence, any claim of harm resulting from any withholding of exculpatory evidence in the first trial was remedied by the second trial, which was not subject to double jeopardy protection. We therefore reject defendant's appeal on both double jeopardy challenges.

### CONCLUSION

¶ 150 We hold that the trial court did not commit reversible error when it ruled that (1) defendant was mentally competent to stand trial; (2) Juror 220 was properly removed for cause from the jury venire; (3) defendant lacked standing to challenge the constitutionality of section 76–2–305 of the Utah Code; (4) the videotape of the crime scene and the prosecutor's statements during closing argument were not victim impact evidence; (5) the clips from defendant's press conferences held before the first trial were admissible; (6) defendant's requested jury instruction regarding mercy or sympathy was improper; (7) Utah's death penalty scheme is constitutional; and (8) double jeopardy was not triggered by trial error or prosecutorial misconduct during his first trial.

¶ 151 We affirm defendant's conviction and sentence.

¶ 152 Associate Chief Justice RUSSON, Justice DURHAM, Justice DURRANT, and Justice WILKINS concur in Chief Justice HOWE's opinion.

---

14. Insufficiency of the evidence is a narrow exception that warrants double jeopardy protection. *See Rudolph*, 970 P.2d at 1231; *State v.* *Musselman*, 667 P.2d 1061, 1065 n. 3 (Utah 1983).